NICHOLAS MALATESTA, Plaintiff-Appellee and Cross-Appellant, v. LEO LEICHTER, Defendant-Appellant and Cross-Appellee.

First District (1st Division)  Nos. 1—88—0038, 1—88—0838 cons.

Opinion filed July 17, 1989.—Rehearing denied August 30, 1989.

Jenner & Block, of Chicago (Thomas P. Sullivan, Russell J. Hoover, Barry Sullivan, and Robert W. Kent, Jr., of counsel), for appellant.

William J. Harte, Ltd., and Richard J. Prendergast, Ltd., both of Chicago (William J. Harte, Richard J. Prendergast, James Prendergast, and Joseph E. Tighe, of counsel), for appellee.

JUSTICE BUCKLEY delivered the opinion of the court:

This consolidated appeal arises from an action brought by Nicholas Malatesta (plaintiff) against Leo Leichter (defendant) for tortious interference with plaintiff's prospective economic advantage. Following a jury trial, plaintiff was awarded $2 million in compensatory damages and $225,000 in punitive damages.

Defendant appeals the jury award, raising the following issues for our review: (1) whether plaintiff is precluded as a matter of law from recovery; (2) whether the jury's findings are against the manifest weight of the evidence; (3) whether the trial court committed reversible error in excluding reference to plaintiff's concealment of a felony conviction; and (4) whether plaintiff made improper closing remarks which require a reversal. Plaintiff cross-appeals the trial court's denial of his motion for sanctions under section 2—611 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—611) and Illinois Supreme Court Rule 219 (107 Ill. 2d R. 219), presenting us with the question of whether the trial court erred in denying his motion. We affirm as to both these appeals.

BACKGROUND

In November 1978, plaintiff and James Lesniak entered into a buy-sell agreement[1] with Robert Thompson for the purchase of Thompson Chevrolet in Villa Park, Illinois, for $1.5 million, and they submitted an application to General Motors to obtain the required approval of the franchise purchase. In reviewing plaintiff's application on March 23, 1979, General Motors contacted defendant, the owner of Biggers Chevrolet in Elgin, Illinois, to confirm plaintiff's statement

---

[1]In a buy-sell agreement, an existing Chevrolet dealer agrees to sell the assets of his business. The agreement does not include the Chevrolet franchise. The prospective purchaser must receive approval from General Motors to obtain the Chevrolet franchise.

that he had owned, from 1970 through 1973, a one-third ownership interest in Biggers Chevrolet. Defendant informed General Motors that plaintiff had never had a prior ownership interest in Biggers Chevrolet. General Motors subsequently disapproved plaintiff's application, and plaintiff did not acquire the Thompson dealership.

### PLAINTIFF'S EFFORTS TO PURCHASE THOMPSON CHEVROLET

In his application to General Motors, plaintiff outlined his experience in automobile sales since 1953, his financial position and his and Lesniak's intent to each invest $250,000, and an additional sum of $100,000 in unsecured financing, if necessary. At trial, plaintiff explained that before applying for the Thompson Chevrolet dealership, he had been a retail automobile salesman, a wholesale manager, a partner in a new car dealership,[2] an owner of a used car dealership, and an automobile wholesaler. Plaintiff also presented testimony from banker Robert Behr, who stated, in response to a hypothetical question, that he "would have recommended that [his bank] look favorably on trying to find a way to make a loan" to plaintiff to cover the operating expenses of Thompson Chevrolet in 1979, although he admitted that there were factors unknown at the time that would have been material to his bank's determination. Lesniak's father, Joseph Lesniak, an experienced automobile dealer, also testified that he would have "backed" his son "up" if he was unable to obtain the necessary financing.

On January 30, 1979, Thompson Chevrolet in Villa Park received "blue-print approval"—General Motors' determination to continue to operate a dealership at the seller/dealer's location. General Motors evaluated candidates for the dealership during the first three months of 1979. David Welday, the Chicago zone manager for the Chevrolet division of General Motors from 1976 to 1980, testified as to General Motors' approval process. He stated that zone management evaluated all applicants to determine the best applicant, that an applicant whom zone management recommended to Chevrolet's regional and central management became the "prime" candidate, and that the existence of a buy-sell agreement does not automatically make an applicant the "prime" candidate. Welday estimated that more than 10 other applicants were on file for the period, but not necessarily for any specific

---

[2]From 1960 to 1963 plaintiff and a partner owned a Studebaker-Triumph dealership, which they ultimately sold because "it just didn't sell." Plaintiff operated the Wilson Ford dealership for approximately 13 days in 1973 but did not purchase it for lack of funds. Plaintiff also owned an American Motors dealership for one year in 1975.

dealership location.

General Motors executive Matthew Harper, whose duties included evaluating applicants and proposals for dealerships, testified that he participated in evaluating plaintiff's application and that "as we had knowledge of a buy/sell [agreement] existing [with Thompson], that made Mr. Malatesta the prime candidate at that time." Welday, on the other hand, testified that General Motors preferred a person whom he believed to be a "Mr. Lee," a black candidate.

Various documents were introduced by the parties in this regard. The request for blueprint approval signed by Welday, dated January 30, 1979, states that the zone has a different applicant than the dealer's chosen applicant and that "management of the Zone is very interested in replacing this dealer point with a minority candidate." A March 13, 1979, memorandum to a General Motors executive which was prepared and signed by John M. Swetish, Harper's assistant manager, recommends that Thompson be notified that General Motors does not consider plaintiff to be the prime candidate.[3] Finally, a March 23, 1979, letter sent from Welday to Thompson states that General Motors is "diligently considering" plaintiff's application.

Following defendant's March 23, 1979, representations to General Motors, Welday, in a March 30 letter, informed Thompson that General Motors had disapproved plaintiff's application as the successor dealer operator of Thompson Chevrolet. In a letter dated June 8, 1979, R.P. Sullivan, an upper-level General Motors executive, notified Thompson that plaintiff had been disapproved because he had misrepresented his interest in Biggers Chevrolet. In response to plaintiff's attorney's pleas to General Motors for a reversal of its decision, General Motors enclosed, in a July 17 letter to plaintiff's attorney informing him that its decision was final, a copy of a July 2 letter from defendant to General Motors, wherein defendant denied plaintiff's prior ownership in Biggers Chevrolet.

At trial, plaintiff also introduced testimony from Harper that the June 8, 1979, letter from Sullivan correctly stated the reasons for General Motors' decision, that plaintiff was not rejected because General Motors wanted a minority dealer in that location, and that he knew of no other reason for rejection of plaintiff's application.

PLAINTIFF'S CRIMINAL CONVICTIONS

In his application for the Thompson Chevrolet dealership, plaintiff represented that he had never been convicted of a crime when in fact

---

[3]Harper's typed name appears on the memorandum without his signature.

he had been convicted of larceny and rape in 1945. General Motors first became aware of plaintiff's criminal record in October 1979, after plaintiff had instituted this litigation and during the course of an investigation supervised by attorney Robert Hallock, who was hired by General Motors to represent it in the litigation.

Before trial, plaintiff moved to exclude any reference to his criminal convictions. Following a *voir dire* of Hallock and General Motors executive Donald Grieve as to the results of their investigation, the trial court ruled that plaintiff's convictions, as well as their concealment, could be referred to during the trial only as "misrepresentations." The court further rejected defendant's suggestion to refer to the convictions as a "felony conviction" and as a "misdemeanor conviction" or as "two crimes."

At trial, Hallock testified to numerous "misrepresentations" which his investigation had uncovered. As to plaintiff's criminal convictions, Hallock testified only that there were two other "inconsistencies," which in his opinion were serious. On cross-examination, plaintiff's counsel attacked the accuracy of many of the "misrepresentations," but conducted no cross-examination as to the criminal-conviction "misrepresentation." On cross-examination of plaintiff, defense counsel was also permitted to elicit from plaintiff that he had answered "no" to a question on his application which should have been answered "yes."

Grieve testified that the misrepresentations were the worst he had ever seen and that he would have recommended plaintiff's termination if plaintiff had obtained the dealership, although on cross-examination he admitted that he had never recommended the termination of any General Motors dealer. Testimony from Welday and Harper revealed that they also would have recommended plaintiff's termination.

Defendant made an offer of proof to the court that had he been permitted to inquire specifically into plaintiff's convictions, (1) Welday and Harper would have testified that plaintiff's criminal-conviction concealment would have warranted rejection of his application, (2) Harper would have testified that plaintiff's convictions would have warranted rejection of his application and that plaintiff's convictions and their concealment both would have been sufficient grounds for terminating plaintiff's dealership if they surfaced after he had obtained the dealership, and (3) Grieve would have testified that he would not have considered plaintiff's application if the convictions had been revealed and would have recommended plaintiff's termination if the facts were discovered after he obtained the dealership.

PLAINTIFF'S RELATIONSHIP WITH BIGGERS CHEVROLET

Defendant entered into a stock purchase agreement with Jerry Biggers of Biggers Chevrolet on November 21, 1969, wherein defendant had the right to purchase all of the Biggers stock over a five-year period for $365,000. After receiving General Motors' approval, defendant purchased 25% of the stock on January 2, 1970. By June 27, 1973, defendant had purchased all of Biggers Chevrolet stock pursuant to an acceleration clause in the agreement, and defendant was the sole record holder of Biggers Chevrolet stock. At trial, plaintiff and defendant disputed whether plaintiff ever had any other ownership interest in Biggers Chevrolet.

Plaintiff testified to the following concerning his association with Biggers Chevrolet. In 1968, he was employed as a used-car manager of Long Chevrolet in Lake Forest, Illinois, at the same time defendant was general manager of the dealership. In response to plaintiff's declaration that he wished to resign from Long Chevrolet, defendant stated that he and plaintiff would "do something" if plaintiff would remain at Long Chevrolet. When defendant learned of the Biggers Chevrolet sale offering, he told plaintiff that he, plaintiff, and Gene Lies would acquire the dealership and each own a one-third interest. Defendant informed plaintiff that plaintiff would not become his partner in the application process because his inclusion could delay the approval process, but he promised that "in five or six months, I'll go to GM and tell them you're a partner *** and get you on paper."

Following defendant's entering into an agreement to purchase Biggers Chevrolet, plaintiff and defendant continued to discuss plaintiff's one-third ownership interest in Biggers Chevrolet. Defendant's stock purchase agreement with Biggers Chevrolet included an initial payment of $89,000, with the remainder to be paid over time from dealership profits. Plaintiff lacked the funds to contribute one-third of the payment. Defendant agreed that plaintiff could "put in 10 percent" and could later "buy in" the rest. Plaintiff issued an $8,900 check payable to defendant on January 2, 1970, the same date that defendant acquired 5,000 shares of Biggers stock.

Plaintiff later sought to increase his participation, and the parties agreed that plaintiff could become a one-third owner of the dealership. On January 2, 1971, plaintiff, defendant, and Lies entered into an agreement entitled "Supplement To That Certain Agreement Dated January 2, 1971 between Nicholas Malatesta, Eugene A. Lies and Leo Leichter," which reflected this agreement:

"The undersigned parties hereby acknowledge that Nicholas Malatesta, pursuant to the terms and conditions set forth in

paragraph 6 of the Stock Repurchase Agreement entered into on the 2nd day of January, 1971, has purchased from Messrs. Leichter and Lies, equal amounts of stock necessary to bring his beneficial interest in Jerry Biggers Chevrolet, Inc. to that maximum percentage allowed in paragraph 6 of the Agreement.

Malatesta further acknowledges that as of this date, he is indebted to said Liechter [sic] in the amount of Seven Thousand and no/100 Dollars ($7,000.00) for the purchase of the beneficial interest in the stock and further agrees that such amount shall be payable on demand to Liechter [sic]."

Plaintiff could not recall the contents of any portion of the stock repurchase agreement mentioned in the agreement, nor did plaintiff offer the stock repurchase agreement into evidence. Plaintiff did introduce checks which he stated were issued pursuant to the supplemental agreement. Plaintiff issued a $12,453 check to defendant on March 10, 1971, a $19,453 check payable to Lies on March 11, 1971, and a $7,525 check payable to defendant on December 23, 1971—the latter payment satisfying the $7,000 indebtedness reflected in the supplemental agreement.

Sometime in 1972, defendant refused plaintiff's requests to increase his ownership beyond his one-third interest, and plaintiff began looking for another dealership opportunity. Plaintiff ultimately received Ford's approval and began operating the dealership on or about November 4, 1973. On November 9, 1973, plaintiff and defendant executed a "Sales Agreement and Acceptance," from which defendant paid plaintiff $90,000, $10,000 of which was represented by a promissory note. The sales agreement provided:

"I, Nicholas Malatesta, do hereby sell, transfer, and convey to Leo Leichter, of West Dundee, Illinois, all of my right, title and interest in common stock interest to thirty-three and one-third (33⅓%) percent of Jerry Biggers Chevrolet, Inc., an Illinois corporation.

The undersigned acquired said common stock per that Certain Agreement, dated January 2, 1971, between Leo Leichter, Eugene A. Lies and the undersigned."

The acceptance to the sales agreement, signed by defendant, provided:

"I hereby agree to purchase all of the common stock interest of Nicholas Malatesta in Jerry Biggers Chevrolet, Inc., for a price of Ninety-Thousand and No/100 Dollars [$90,000] and further agree to execute my Promissory Note in the amount of

Ten-Thousand and No/100 Dollars [$10,000], payable on or before May 9, 1974, bearing interest at the rate of ten percent [10%] per annum."

Plaintiff elicited testimony from defendant's attorney, Richard Buhrfiend, on adverse examination, that these documents were typical for transactions involving the sale of assets.

Defendant testified to the following concerning plaintiff's relationship with Biggers Chevrolet. As to the 1970 and 1971 transactions, defendant stated that he never discussed entry into any joint ownership agreement with defendant and that the January 2, 1971, "Supplemental Agreement" referred to loans unconnected to his purchase of Biggers Chevrolet. He testified that the checks plaintiff issued to defendant in 1979 represented plaintiff's loans to defendant and that the check to Lies in 1971 retired a portion of defendant's contemporaneous debt to Lies.

Defendant further submitted as exhibits a January 14, 1971, promissory note signed by defendant and payable to General Motors Acceptance Corporation (GMAC) in the amount of $120,000, and January 14, 1971, subordination agreements signed by plaintiff and Lies in which each acknowledged that defendant owed him $30,000 and each agreed to subordinate his debt from defendant to defendant's debt to GMAC. Defendant admitted, though, that the repayment schedule identified in the agreement was constructed only so that GMAC could see how the loan was broken down and that no payments were ever made to plaintiff in the manner described.

As to the 1973 transaction, defendant testified that the documents were prepared solely to assist plaintiff in his efforts to obtain the Wilson Ford dealership in 1973. Defendant further stated that his 1973 check and note to plaintiff were repayments of loans, which also included payments for interest, car payments and other miscellaneous items.

The following additional evidence was adduced at trial. Lies testified that he never owned any stock in Biggers Chevrolet and that the purpose of the March 1971 payment he received from plaintiff was to retire a portion of defendant's debt. Lies admitted, though, that he never requested or arranged to have plaintiff retire the indebtedness on defendant's behalf and that he had no agreement with defendant pertaining to the terms identified in the subordination agreement.

William Stein, defendant's personal accountant, testified on adverse examination that defendant never told him in 1973 or 1974 that he had retired a personal debt, nor did defendant take interest deductions for the retirement of a debt on his personal tax returns for

those years. Defendant also elicited testimony from plaintiff on adverse examination that plaintiff never related his stock interest to any Biggers Chevrolet or General Motors employees during the 1970-73 period.

DEFENDANT'S REPRESENTATIONS TO GENERAL MOTORS

On March 23, 1979, Welday and Grieve telephoned defendant. In response to their inquiries, defendant stated that plaintiff had never had any ownership interest in Biggers Chevrolet. At trial, defendant testified that he was not told the purpose of the call or that plaintiff had submitted an application for any dealership during this conversation and that he did not learn of plaintiff's attempts to acquire Thompson Chevrolet prior to his filing this lawsuit. In addition to defendant's testimony, the following other evidence was adduced at trial as to the March 23 conversation. An internal memorandum prepared by Welday on March 23 provides:

"The purpose of this call was to clarify information indicated on the Application for Dealer Sales and Service Agreement of Mr. Nicholas Malatesta that he owned 33% of Jerry Biggers Chevrolet, Inc., Elgin, Illinois, during the period 1970 to 1973. I asked Mr. Leichter if Mr. Malatesta ever had any ownership in Biggers Chevrolet, to which Mr. Leichter replied 'never'. I advised Mr. Leichter that because of the seriousness of this matter that he might be called upon to again verify this statement to which he replied, 'of course I will'. He went on to state that he did borrow $30,000 in late 1969 or early 1970 from Mr. Nicholas Malatesta on a personal note and to his best recollection, this note was paid off in 1973. We asked if he had a copy of this note to which he replied, 'I don't think so but I do have a copy of the cancelled check which included interest.' "

As to this memorandum, Welday stated that it was "my feeble attempt to put down on a piece of paper, to the best of my recollection, what transpired in a telephone conversation as it relates to a business matter." He further testified that he did not recollect whether he told defendant that plaintiff had submitted an application to Thompson Chevrolet or had entered into a buy-sell agreement. He also stated that he did not recall any policy regarding disclosure of information to persons.

Grieve testified, on examination by plaintiff's counsel, that he had no specific recollection of what was said in the March 23 conversation beyond "what's so stated in the memo." On questioning by defendant's counsel as to whether portions of the memorandum were com-

municated and others not, Grieve stated "what we discussed with Mr. Leichter is in the memo." He testified later that he never told defendant "any of the details" about Thompson Chevrolet or the fact that plaintiff had a buy-sell agreement, but responded as follows to questioning by defense counsel:

"Q. Did you ever discuss in this conversation, you and Mr. Welday, the purpose of the call was to clarify information because Mr. Malatesta was making an application?

A. He did, and we asked him, did he own 33 percent."

Finally, Grieve stated it was their policy not to disclose to third parties the business of the applicants.

On June 29, 1979, E.L. Berberich telephoned defendant and asked him to send the Biggers Chevrolet stock records to General Motors. In a letter dated July 2, 1979, to Welday, defendant again stated, "[A]t no time was the stock owned by anybody but Jerry Biggers and myself."

PLAINTIFF'S DAMAGES

As evidence of his damages, plaintiff introduced testimony from Lawrence Roesch, who has owned and operated the Thompson dealership plaintiff sought to acquire since October 14, 1981. He testified that his salary from 1982 through 1986 totalled $358,000 and that he received profits from his "sub-chapter S" corporation of $79,289 for 1982, $144,000 for 1983, $159,000 for 1984, $690,000 for 1985, and $222,000 for 1986. The total salaries and profits paid directly to him, exclusive of debt and operating costs of the dealership, exceeded $1.6 million for the period 1982 through 1986. He further stated the net worth of the dealership increased from $382,000 in 1982 to $917,000 in 1986. Roesch also recounted various improvements made to the dealership with an appraised value for insurance purposes of $1,131,042, which he paid through short-term loans and operating revenues. Roesch admitted that his 35 years of experience as an automobile dealer, his strong reputation, and his ability to utilize experienced employees from his Elmhurst Chrysler dealership were important to his successful operation. Through Roesch's figures, plaintiff comparatively argued to the jury that his damages ranged from $1.6 million to $2.4 million.

Ray Throckmorton, an accountant with Wolf & Company, testifying as defendant's damages expert, stated that Roesch's operating statements did not provide an adequate foundation for calculating plaintiff's damages because no basis existed for comparing plaintiff's and defendant's management capabilities, advertising strategies,

profit-sharing plans, types of cars sold, business plans, access to capital, interest rates, depreciation, and employees.

Throckmorton expressed an opinion as to the profitability of plaintiff's venture. Based upon the assumptions that between 1979 and 1981 Thompson Chevrolet had no gross income and that plaintiff was obligated to pay to Thompson $11,000 per month to rent, not including any operating expenses, he stated that the profitability would be zero. On cross-examination, Throckmorton admitted that he did not review documents for Thompson Chevrolet from 1979 to 1981, that his hypothetical assumed no gross revenue during those years, and that no one informed him Thompson Chevrolet had no gross sales for that period. He also admitted that he did not know that Roesch personally had been distributed almost $1.3 million in profits· during the 1982-1986 period and that the company net worth increased over $500,000 from 1981 through 1986, and he further conceded that plaintiff indeed might have been a better operator than Roesch.

On cross-examination, plaintiff also asked Throckmorton a series of hypothetical questions concerning calculating the value of a business. Throckmorton stated that value judgments in the context of a buyout of a minority shareholder's interest are made by analyzing the profitability and net worth of similar companies in the same business, even though there may be many differences between the companies. Throckmorton also acknowledged that one can value a business based upon "income stream," capitalizing the average net income of the business over the previous five years, but stated on redirect examination that this means of valuing a business had no application to the present case. Plaintiff argued to the jury that by applying Throckmorton's analysis under this approach, his damages would approximate $2.5 million.

## OPINION

■ Illinois recognizes actions for tortious interference with prospective economic advantage provided a plaintiff can establish (1) his reasonable expectancy of entering into a valid business relationship; (2) defendant's knowledge of his expectancy; (3) defendant's intentional interference which prevents his expectancy from ripening into a valid business relationship; and (4) damages to plaintiff as a result of such interference. (*Heying v. Simonaitis* (1984), 126 Ill. App. 3d 157, 466 N.E.2d 1137; *Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.* (1973), 16 Ill. App. 3d 709, 306 N.E.2d 549; *Crinkley v. Dow Jones & Co.* (1978), 67 Ill. App. 3d 869, 385 N.E.2d 714; *Thorne v. Elmore* (1979), 79 Ill. App. 3d 333, 398 N.E.2d 837.)

Addressing defendant's contentions as to these elements, we commence with plaintiff's proof as to his reasonable expectancy of entering into a valid business relationship. Defendant initially argues that the trial court erred in refusing to enter a judgment notwithstanding the verdict because no "valid" business relationship could exist as a matter of law since any hoped-for contract with General Motors would have been unenforceable on grounds of plaintiff's fraudulent concealment in his application.

■ We note at the outset that defendant did not posit this particular argument in the trial court. While defendant argued that plaintiff's "misrepresentations" indicated an absence of a reasonable expectancy, he did not argue the theory of the validity of the expected relationship. Illinois courts have frequently held that issues not presented to or considered by the trial court may not be first raised on review and that theories raised in the lower court may not be changed on review. (*Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 324 N.E.2d 417; *Tomaso v. Plum Grove Bank* (1985), 130 Ill. App. 3d 18, 473 N.E.2d 588.) We do not believe, as defendant urges, that the argument is sufficiently similar to that made in the trial court to give adequate notice to plaintiff.

In addition, as a further procedural bar to hearing this contention on appeal, the record lacks evidence to establish the existence of a scheme to defraud. Little or no evidence exists here of materiality, intent, and reliance—essential elements of a cause of action for fraud. (See *Parsons v. Winter* (1986), 142 Ill. App. 3d 354, 359, 491 N.E.2d 1236, 1239-40.) On the question of knowledge or intent, for example, while the record shows that plaintiff, through testimony and arguments of counsel, conceded that he answered incorrectly "no" to the criminal-conviction question on the application, it is silent as to whether plaintiff acted intentionally or unintentionally. Thus, it would be inappropriate for this court to assume the existence of a fraudulent scheme where such a finding lacks support in the record and where plaintiff had no opportunity to respond in the trial court.

■ Notwithstanding these procedural bars, we find defendant's contention lacks merit. To support his contention that plaintiff is barred as a matter of law from suing for interference with an expectancy he hoped to obtain by fraud, defendant sets forth two propositions as "Illinois law." The first proposition is a general rule that a person cannot sue for interference with a contract that is unenforceable. The rule in interference-with-contract cases, to which defendant refers, has been applied only to contracts that are void from their inception due to their subject matter or the lack of the necessary forma-

tion requisites. See *Ladesic v. Servomation Corp.* (1986), 140 Ill. App. 3d 489, 493, 488 N.E.2d 1355, 1358; *Marvin N. Benn & Associates, Ltd. v. Nelson Steel & Wire, Inc.* (1982), 107 Ill. App. 3d 442, 449, 437 N.E.2d 900, 905; *Consolidated Packaging Machinery Corp. v. Kelly* (7th Cir. 1958), 253 F.2d 49, 51.

Defendant has not cited any cases holding that a person cannot sue for interference where the contract is merely voidable, as the purported fraud in the inducement would render the contract here. In *Ladesic v. Servomation Corp.* (1986), 140 Ill. App. 3d 489, 493, 488 N.E.2d 1355, 1358, the contract was clearly void for lack of the requisite formation requirements. *Marvin N. Benn & Associates, Ltd. v. Nelson Steel & Wire, Inc.* (1982), 107 Ill. App. 3d 442, 449, 437 N.E.2d 900, 905, and *Consolidated Packaging Machinery Corp. v. Kelly* (7th Cir. 1958), 253 F.2d 49, 51, the cases defendant cites as strictly applying the rule where a statute is violated, involve contracts held to be *void* in violation of public policy because they violated statutes. We reject defendant's contention that *Marvin* and *Consolidated* are analogous to the instant case because plaintiff here has violated a Federal mail fraud statute by using the mails to execute his scheme to defraud. Not only is the record devoid of the necessary proof to establish a violation of any statute, unlike *Marvin* and *Consolidated,* the contract's subject matter here, or the nature of the contract itself, does not violate a statute.

Defendant's second assertion of law is that a person may not sue for interference with a prospective business relationship which, if consummated, would have been voidable because of his own wrongdoing. Defendant misinterprets his sole authority for this proposition, *Stamatiou v. United States Gypsum Co.* (N.D. Ill. 1975), 400 F. Supp. 431, *aff'd* (1976), 534 F.2d 330. In *Stamatiou,* a company entered into an agreement with the plaintiff to give him money in exchange for information relating to the company's legal claim to engineering documents after the plaintiff threatened to withhold the information. The plaintiff requested the court to compel the company to return the money it had paid to him, but was later seized upon his arrest. The court found the contract unenforceable because it violated a theft statute, and, therefore, there could be no malicious interference with rights created by it. *Stamatiou,* 400 F. Supp. at 435.

Defendant asserts on appeal that the contract in *Stamatiou* "was not the type of illegal contract that was completely void, because the parties to the contract were not *in pari delicto.*" Defendant apparently reaches this conclusion from the court's response to the plaintiff's argument that the court could not intervene to set aside the con-

tract because the parties were *in pari delicto*. The court stated that even assuming the parties were *in pari delicto*, the principle would not apply there because the plaintiff himself was requesting the court to intervene to enforce the contract, affirmative action that plaintiff argued was prohibited because the parties were *in pari delicto*. In rejecting the plaintiff's argument, the court never stated that there could be no malicious interference with rights because the contract was voidable. Rather, the contract was clearly void as against public policy because it was an illegal contract. Furthermore, *in pari delicto* is a principle applied to illegal, *void* contracts where a person seeks enforcement of a contract which is void because it is illegal or against public policy. See, *e.g.*, *O'Hara v. Ahlgren, Blumenfeld & Kempster* (1987), 158 Ill. App. 3d 562, 511 N.E.2d 879, 882; *Leoris v. Dicks* (1986), 150 Ill. App. 3d 350, 354, 501 N.E.2d 901, 904; *Corti v. Fleisher* (1981), 93 Ill. App. 3d 517, 532, 417 N.E.2d 764, 776.

Finally, defendant's reference to the *Stamatiou* court's finding, on the company's counterclaim, that the plaintiff's conduct in violating the theft statute constituted duress, thereby rendering it voidable and entitling the company to seek equitable relief of rescission and restitution, also does not support its interpretation of the case. That finding was separate and distinct from its holding that the plaintiff was precluded from suing for interference with a prospective business relationship.

Thus, as defendant cites no case law which supports his position that a plaintiff is barred as a matter of law from claiming tortious interference with a prospective business relationship where the expected contract would have been voidable, we decline to find that a valid business relationship may not exist where a contract is merely voidable.

Defendant next contends that the evidence does not support the jury's finding that plaintiff had a reasonable expectancy of obtaining the Thompson dealership. He argues that the evidence, even when viewed most favorably to plaintiff, fell far short of the required level of certainty to prove plaintiff's expectancy. Defendant cites *Stefani v. Baird & Warner, Inc.* (1987), 157 Ill. App. 3d 167, 510 N.E.2d 65, as support for his contention. In *Stefani*, the plaintiffs sued their real estate broker because she had arranged for another customer to purchase a home on which the plaintiffs had submitted offers and counteroffers. The court found no valid business expectancy where plaintiffs were merely one of any number of potential buyers of the property, the property had been listed for sale with a multiple-listing service, and the owner had not agreed to plaintiff's counteroffers.

Defendant urges that we find the instant case indistinguishable from *Stefani* because General Motors retained absolute discretion over which of the at least 10 applicants would receive the dealership. Unlike the situation here, however, the negotiations in *Stefani* were merely preliminary and the plaintiffs had not reached the first step of an acceptable offer. More analogous, we believe, is *Fishman v. Estate of Wirtz* (7th Cir. 1986), 807 F.2d 520, wherein the Seventh Circuit, applying Illinois law, found a reasonable expectancy where the plaintiff investment group bidding for the Chicago Bulls professional basketball franchise had executed a contract with the seller but had not yet received the required NBA approval.[4]

■ After a careful review of the record, we cannot conclude that the jury's finding that plaintiff had a reasonable expectancy of obtaining the Thompson dealership is against the manifest weight of the evidence. The record discloses sufficient evidence to support the jury's finding. First, plaintiff presented evidence from which the jury could conclude that plaintiff was the leading candidate for the dealership. Plaintiff was the sole candidate who had a contract to purchase the Thompson dealership. Although plaintiff needed General Motors' approval to obtain the franchise, General Motors executive Harper testified that plaintiff was the prime candidate because of the buy-sell agreement. In addition, General Motors had advised Thompson shortly before defendant's representation that it was "diligently considering" plaintiff's application. Plaintiff also had experience in the automobile business, including some ownership experience. Defendant himself had stated in 1973 that plaintiff was one of the most capable automobile executives with whom he had worked. Second, plaintiff presented evidence from which the jury could find that plaintiff had the means to obtain the necessary financing. Finally, a high-level executive's letter and Harper's testimony clearly demonstrated that the only reason General Motors rejected plaintiff's application was its belief that plaintiff had falsely claimed a former ownership interest in Biggers Chevrolet.

Defendant presents numerous arguments to advance his position that the above evidence is insufficient to support the jury's finding. First, he argues that the evidence is insufficient because it rests primarily on Harper's testimony that plaintiff's buy-sell agreement made

[4]The National Basketball Association's Board of Governors, comprised of one representative from each NBA franchise, makes all business decisions for the NBA. The transfer or sale of a franchise had to be approved by 13 out of 17 governors for the sale to become final. *Fishman*, 807 F.2d at 526.

him the "prime candidate," which testimony loses its significance when viewed in the context of all the evidence. Specifically, defendant refers to the lack of evidence of an explanation as to what Harper meant by the term "prime candidate," Welday's testimony that a person must both execute a buy-sell agreement and have the recommendation of zone management to be a prime candidate, the fact that Harper's typed signature appears on a March 13, 1979, memorandum recommending Thompson be notified that Chevrolet did not consider plaintiff as its primary candidate, and Harper's admission that General Motors had chosen Lee as a potential minority candidate.

We do not believe Harper's testimony loses its significance by this evidence. The memorandum recommending notification that plaintiff was not a prime candidate not only was unsigned, but is contrary to a later letter sent to Thompson advising him that General Motors was diligently considering plaintiff's application. The evidence concerning a potential minority candidate did not establish that General Motors had selected a minority as the chosen applicant, but merely that some General Motors employees were considering replacing the dealership point with a minority candidate and that Lee was the leading minority applicant. Moreover, any conflict in Harper's and Welday's testimony was a matter for the jury to determine.

Defendant next asserts that the evidence is inadequate because it failed to demonstrate that General Motors had singled plaintiff out for approval or that his experience and financial resources were superior to those of the other applicants. As stated previously, we find sufficient evidence from which the jury could conclude plaintiff was the leading candidate for the Thompson dealership. We further find that plaintiff presented sufficient evidence as to his experience and financial resources and that plaintiff was not required to present evidence of other applicants' qualifications.

Finally, defendant argues that plaintiff could not have had a reasonable expectancy even if the evidence established plaintiff had been the prime candidate, because had General Motors proceeded with its consideration of plaintiff's candidacy and its investigation of plaintiff's background, it would have rejected plaintiff's application upon learning of plaintiff's criminal record. Defendant's assertions in this regard rest on mere speculation and, thus, are insufficient to negate plaintiff's proof as to his "reasonable" expectancy.

■ Turning to defendant's contention as to the second element of plaintiff's action, defendant maintains that plaintiff failed to meet his burden of showing that defendant knew of his expectancy of obtaining the Thompson dealership. He argues that plaintiff was required to

demonstrate more than defendant's knowledge of plaintiff's application for some dealership, but that defendant knew of negotiations with, or a buy-sell agreement with, the particular dealership location.

In support of his contention, defendant cites *Futurevision, Inc. v. Dahl* (1985), 139 Ill. App. 3d 61, 66-67, 487 N.E.2d 127, 131. In *Futurevision*, this court found that Futurevision failed to state a cause of action for interference with a prospective business advantage because its complaint failed to contain an allegation of knowledge by the defendants of Futurevision's negotiations concerning a certain show with Spectrum, a pay television service. Defendant argues that *Futurevision's* holding rests on Futurevision's failure to allege that the defendants knew of Futurevision's attempts to sell the show to Spectrum, *in particular*. No language to this effect appears in this opinion—nor is defendant's interpretation of the court's ruling founded in fact, as the opinion does not indicate that the defendants knew of Futurevision's endeavors to sell the show to any television network.[5] *Futurevision*, 139 Ill. App. 3d at 63-64, 487 N.E.2d at 129-30.

Illinois courts have not required knowledge of the specific details of a plaintiff's prospective business relationships in similar circumstances. In *O'Brien v. State Street Bank & Trust Co.* (1980), 82 Ill. App. 3d 83, 401 N.E.2d 1356, the court held that the plaintiff's allegations of knowledge were sufficient where he merely alleged knowledge of the plaintiff's business relationships and not knowledge of the specific customers or the nature of the relationships. Similarly, in *Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.* (1973), 16 Ill. App. 3d 709, 306 N.E.2d 549, the court found that the plaintiff alleged a cause of action for interference with prospective economic advantage by alleging that the defendant intentionally sought to prevent the plaintiff from entering into credit agreements with potential creditors by publishing a negative credit report, although there was no indication that the defendant knew the nature of the proposed dealings between the plaintiff and its potential customers when it published its report. (See also *Crinkley v. Dow Jones & Co.* (1978), 67 Ill. App. 3d 869, 385 N.E.2d 714; *Colucci v. Chicago Crime Comm'n* (1975), 31 Ill. App. 3d 802, 334 N.E.2d 461.) Thus, we hold that plaintiff was not required to prove defendant's knowledge of the specific General Motors dealership to which plaintiff had made application.

---

[5]The facts in *Futurevision* demonstrate, at most, that the defendants knew of an agreement between Futurevision and Dahl for Futurevision to be involved in the production and marketing of the show. *Futurevision*, 139 Ill. App. 3d at 63-64, 487 N.E.2d at 129-30.

Defendant has alternatively argued that plaintiff failed to prove that defendant knew of plaintiff's application to any dealership. He asserts that the evidence plaintiff adduced to prove that defendant was informed of the purpose of General Motors' March 23, 1979, inquiry "loses its significance" in light of the other evidence.

At trial, plaintiff introduced a March 23 memorandum prepared by Welday, stating that the purpose of the March 23 telephone inquiry was to clarify information indicated on plaintiff's "Application for Dealer Sales and Service Agreement." Welday explained that the memo was his attempt to put down what transpired in the conversation. In response to questioning by defense counsel, Grieve testified, "What we discussed with Mr. Leichter is in the memo." He also answered in the affirmative when questioned as to whether they discussed that the purpose of the call was to clarify information on plaintiff's application.

We find that this evidence supports the jury's finding that Welday and Grieve informed defendant of the purpose of their inquiry and that the other evidence to which defendant adverts does not mandate a different conclusion. Defense counsel's attempt to elicit from Welday that only portions of the March 23 memorandum prefaced by "I asked" or "I advised" were communicated to defendant produced only an equivocal response.[6] The fact that Grieve responded in the form of a compound answer to the question of whether they related the purpose of the telephone call and the fact that he stated at one point that their policy was not to disclose to third persons an applicant's business also do not require that we discredit his testimony.

■ Defendant next presents for our consideration the adequacy of plaintiff's proof on the element of damages. He initially contends that under Illinois law, the existing Thompson dealership owner's testimony as to his profits and costs in the years 1982 through 1986 may not serve as a basis for computing plaintiff's lost profits because the Thompson dealership would have been a new business for plaintiff.

---

[6]Defendant refers to the following dialogue between defense counsel and Welday:

"Q. And at certain points in the memo, you used certain words, as 'asked' is that correct?

A. I will have it [sic] read it again. I asked Mr. Leichter. I advised Mr. Leichter. We asked for a copy, okay.

Q. And would you say that was generally your practice that when you wanted to record actually what had taken place in terms of communications, you would characterize it in that fashion?

A. I would assume so. I'm not volunteering anything, but I'm not a lawyer. So I don't know the legal jargon and those kinds of things. We are doing the best we can as a business."

The "new business" rule to which defendant refers has been applied by courts in contract cases involving lost profits to ascertain whether a plaintiff's proof as to damages satisfies the requirement that damages be proven to a reasonable certainty. (*Midland Hotel Corp. v. Reuben H. Donnelley Corp.* (1987), 118 Ill. 2d 306, 515 N.E.2d 61; *Drs. Sellke & Conlon, Ltd. v. Twin Oaks Realty, Inc.* (1986), 143 Ill. App. 3d 168, 491 N.E.2d 912; *Midwest Concrete Products Co. v. La Salle National Bank* (1981), 94 Ill. App. 3d 394, 418 N.E.2d 988; *Barnett v. Caldwell Furniture Co.* (1917), 277 Ill. 286, 115 N.E. 389.) Illinois courts have generally found in situations where lost profits are sought for interruption or delay in a business that the "reasonable certainty" requirement may be satisfied through evidence of a plaintiff's past profits in an established business, but that the lost profits of a new business would be too speculative. *Drs. Sellke & Conlon, Ltd.*, 143 Ill. App. 3d 168, 491 N.E.2d 912; *Favar v. Riverview Park* (1908), 144 Ill. App. 86, 91.

■ In the case at bar, we are presented with a situation unlike that in which courts have applied the above rule. The business in issue here was never interrupted or delayed by defendant's conduct; rather, plaintiff was prevented from acquiring a business which was in existence at the time of, and which continued after, the purported wrongful conduct and which at all times was owned by a person other than plaintiff. The guiding rule that a plaintiff's past profits in an established business may prove his damages to a reasonable certainty is inapposite here because the business was not owned by plaintiff during those years. Yet, the guiding rule that a new business' profits are too speculative to prove a plaintiff's damages to a reasonable certainty also does not fit our circumstances because the business here does not have the same uncertainties that are akin to a business which is not in existence at the time of, and does not continue after, the wrongful conduct. Thus, the established/new business method of determining whether damages could be proven to a reasonable certainty does not aid our determination here.

Plaintiff directs our attention to two cases where courts found similar proof not to be too speculative to prove a plaintiff's damages. In *Rhodes v. Sigler* (1976), 44 Ill. App. 3d 375, 357 N.E.2d 846, the court found evidence of the profits of a person other than the plaintiff in the same period of time plaintiff was seeking damages provided the required degree of certainty. The plaintiff-tenant, in *Rhodes*, sought lost-profit damages for the period of time that defendant unjustly withheld possession of the farmland from him. The defendant operated the farmland during this period at a profit. The court noted that

due to the contingencies inherent in the farming business, a plaintiff's past profits in an established business traditionally would not have provided the required degree of certainty, but it found sufficient certainty of the plaintiff's profits existed there due to the advances in modern farming and the fact that the crops there were in fact grown by the defendants during the period damages were sought. *Rhodes*, 44 Ill. App. 3d at 380, 357 N.E.2d at 850.

In a Seventh Circuit case, *Fishman v. Estate of Wirtz* (7th Cir. 1986), 807 F.2d 520, 555-58, applying Illinois law, the court sustained a seven-figure verdict based upon the financial experience of the owners of the Chicago Bulls professional basketball franchise for a 10-year period after the plaintiffs, who had never previously owned the franchise, were wrongfully precluded from acquiring the franchise. The district court noted in *Fishman*:

"We are not, of course, concerned about over-speculative damages in the instant case. The Bulls did not go out of business but instead continued in business in the hands of [the owners of the Bulls for the 10-year period damages were sought], giving the court * * * an exceptionally helpful guide to [plaintiff's] damages." *Fishman*, 807 F.2d at 552.

We likewise conclude that evidence of the profits of a person other than plaintiff, who operated the same established business at the identical location for the period of time which plaintiff seeks damages, is not of such a speculative nature to require a finding that plaintiff's lost profits may not be proved to a reasonable certainty.

Defendant further argues that the evidence of Roesch's profits during the years in question is insufficient because plaintiff did not establish the foundational comparability of his expectancy and Roesch's operations. Specifically, defendant argues plaintiff did not present sufficient evidence of their respective business plans, their past histories of profitability with new car dealerships, the experience level of the employees they intended to hire, the extent of their anticipated capitalization of the venture, and the comparability of their expenses.

As defendant correctly points out, there are differences between Roesch's and plaintiff's experience, name recognition, access to employees and many potential differences in their operation of the business. A finding that profits are too speculative based upon these differences, however, would preclude recovery for intentional interference with prospective economic advantage in most instances. Furthermore, in proving lost profits to a reasonable certainty, it is not necessary that the amount of the loss be proven with absolute certainty. (*Midland Hotel*, 118 Ill. 2d at 315, 515 N.E.2d at 66.) As noth-

ing in the record indicates that plaintiff would not have been as successful as Roesch, we do not believe these differences render the damages unduly speculative.

Defendant further argues that plaintiff failed to adduce the requisite evidence to show that his revenues or his expenses would have been comparable to Roesch's to justify basing his damages on Roesch's net profits. As to their respective costs, defendant directs us to the fact that plaintiff had agreed to pay $1.5 million for the real property to be financed over 29 years, while Roesch paid only $1 million, of which only $870,000 was debt. He also refers to the fact that plaintiff had agreed to pay $100,000 at closing for fixtures for which Roesch paid $40,000. We do not believe these differences in costs militate against using Roesch's net profits as the yardstick for quantifying plaintiff's lost profits here. It is recognized that in awarding lost profits, profits will to some extent be uncertain and incapable of calculation with mathematical precision. *Midland Hotel*, 118 Ill. 2d at 315-16, 515 N.E.2d at 66.

As to other differences affecting revenue, defendant adverts to Roesch's testimony that because of the condition of the physical facilities, he was required to make improvements from operating revenues with borrowings from his other dealership, while plaintiff failed to offer evidence as to the amount of capital that he was prepared to contribute to the venture. We find that plaintiff presented sufficient evidence from which a jury could have found that plaintiff had the necessary financial backing to make necessary improvements to the dealership.

In addition to the above arguments on the element of damages, defendant argues that plaintiff misapplied the methods of calculating damages based upon a similar operation. In closing arguments, plaintiff's counsel utilized Roesch's financial experience under two approaches in arguing a reasonable range of damages to the jury. Under the first approach, the jury was asked to assume that if plaintiff purchased the dealership in 1979, he would have run it at a break-even point through 1982. Roesch's figures from 1983 through 1986 were then calculated. Roesch's salary of $358,000, profits of $1,294,289 and the company's enhanced net worth of $535,000 were added to the value of the real estate as determined by Roesch's $1,040,000 purchase price for the real estate, and the resulting sum of approximately $3.2 million was divided by two to reflect plaintiff's one-half interest in the proposed venture. The jury was also asked to award future damages for a five-year period to the 60-year-old plaintiff, projected on the basis of Roesch's profits and income for the five years

prior to trial. One-half of those profits, representing plaintiff's interest in the venture, amounted to $800,000. On the above calculations, plaintiff argued that $1.6 million to $2.4 million would be a reasonable range of damages.

Plaintiff's second approach relied on testimony which plaintiff elicited from the expert evaluating plaintiff's damages on defendant's behalf. He testified as to valuing a business based upon "income stream." This calculation averaged five years of salary and distributed profits, capitalized the average income figure at a rate of 8%,[7] and then subtracted plaintiff's purchase price. Taking one-half of this amount as plaintiff's interest in the venture, plaintiff then added to this figure one-half of the value of the improved real estate and one-half of the income and salary derived from the five years preceding trial for future damages. The result of this calculation approximated $2.5 million.

Defendant argues that these approaches have a number of unsupported assumptions and fallacies. While defendant correctly points out that the first approach has a number of assumptions, including that the operating revenues would be sufficient to pay for costs of the mortgage[8] and that plaintiff would have "broken even" during the years 1979 through 1981,[9] such assumptions do not render the valuation faulty. Because lost profits necessarily involve some uncertainty, proof of inferential character is permitted. (*Vendo Co. v. Stoner* (1974), 58 Ill. 2d 289, 310, 321 N.E.2d 1, 13.) We further do not believe, as defendant urges, that plaintiff was required to include in his valuation suggestions to reduce the future damages award to its present value or that damages be offset by "opportunity cost." We find that plaintiff's arguments as to the methods to valuate plaintiff's lost profits were proper and that the jury's award of $2 million was supported by the evidence.

■ Finally, we consider the trial errors claimed by defendant and whether any error requires a reversal of the jury award. Defendant first directs us to the trial court's exclusion of reference to plaintiff's felony convictions. Upon plaintiff's pretrial motion to exclude any reference to his criminal convictions and a *voir dire* of Hallock and

---

[7]The 8% rate was based upon Throckmorton's testimony that 8% to 10% was a good 1986 capitalization rate.

[8]Plaintiff did not subtract the cost of his mortgage based upon Roesch's testimony that his operating revenue, through leasing the property to his dealership for a rent, was sufficient to pay his mortgage, taxes and insurance on the property.

[9]Plaintiff did not present evidence of the profits for the years 1979-1981, nor did he seek damages for this period.

Grieve as to the results of their investigation, the trial court ruled that plaintiff's omission of his convictions could be referred to during the trial only as "misrepresentations." The court further rejected defendant's suggestion to refer to the convictions as a "felony conviction" and as a "misdemeanor conviction" or as "two crimes."

At trial, Hallock testified to a number of minor "misrepresentations" uncovered by his investigation. As to plaintiff's 1945 larceny and rape convictions, Hallock testified only that there were two other "inconsistencies," which in his opinion were serious. On cross-examination of plaintiff, defense counsel was also permitted to elicit that plaintiff had answered "no" to a question on his application which should have been answered "yes." Grieve testified that the misrepresentations were the worst he had ever seen and that he would have recommended plaintiff's termination if plaintiff had obtained the dealership, although on cross-examination he admitted that he had never recommended the termination of any General Motors dealer. Defendant also offered the testimony of Welday and Harper that they also would have recommended plaintiff's termination.

Defendant urges that the court's limitation prevented him from fully developing his defense on issues of causation and damages and plaintiff was thereby able to discredit the testimony that General Motors executives would have rejected plaintiff's application or terminated it. He argues that the error is compounded because any potential prejudice resulting to plaintiff would have been minimal due to plaintiff's suggestion that reference could be made as two criminal convictions or crimes instead of specific reference to the larceny and rape convictions.

We do not find that the trial court abused its discretion in ruling on the admissibility of this evidence. Evidence that plaintiff had prior felony convictions would be clearly prejudicial to plaintiff, and the testimony relating to these convictions and the inferences as to causation and damages sought to be drawn therefrom were mainly speculative. General Motors did not learn of plaintiff's convictions until an investigation ensued as a result of the institution of this lawsuit. Whether General Motors would have discovered plaintiff's convictions and whether they would have rejected or terminated plaintiff is highly speculative. In view of the speculative nature of this testimony, the trial court allowed defendant considerable leeway in presenting this evidence.

■■■ Defendant next objects to plaintiff's counsel's remarks during closing argument. He urges that we order a new trial because

plaintiff's counsel improperly expressed his personal opinion as to the credibility of witnesses, asserted experiences in other cases, relied on facts not in evidence, and drew legally impermissible inferences from the evidence. After reviewing the record, we conclude that a new trial is not warranted by any of counsel's remarks in closing argument.

Plaintiff's counsel's statement, "No, I don't think everybody was lying in this case, but I think Leo Leichter lied like a rug," while an expression of a personal opinion, was invited by defense counsel's closing remarks. Defense counsel stated that plaintiff was calling all defense witnesses liars, insinuating that plaintiff's case was fabricated. Plaintiff's counsel's comments that the other applicants and Mr. Lee were not called as witnesses were also invited. Although it is established that comment on the failure to produce a witness is not proper unless the record shows that the witness was under the control of the opposing party (*Foerster v. Illinois Bell Telephone Co.* (1974), 20 Ill. App. 3d 656, 662, 315 N.E.2d 63, 68), the record here demonstrates that defense counsel had argued in closing that plaintiff had chosen not to present other applicants for the Thompson dealership and also argued in his opening statement that Lee was the candidate favored by General Motors, yet produced little evidence to support the claim.

Plaintiff's counsel's statements, "I do not understand a man who can do what he did here. *** Why he took the stand and said that is an absolute mystery to me," referred to defendant's damages expert and was fair comment on his conclusion that plaintiff's expectancy would not have been profitable. Counsel's argument that defendant already had a prior conversation with Grieve and Welday prior to March 23, 1979, was not objected to by defendant at trial. In any event, the comment was a proper argument as to an inference to be drawn from evidence that defendant had regular contact with Welday and Grieve and that defendant was prepared with specific details relating to the matter on March 23.

Finally, while the remaining comments defendant refers to may have been improper, we do not believe the comments were so prejudicial as to deny defendant a fair trial. Plaintiff's counsel improperly commented on his personal experience, by stating, "I consider [this case] to be one of the most egregious exercises in perjury I have ever seen." This comment is not as prejudicial as the specific details of other crimes mentioned in the case cited by defendant, *Hansel v. Chicago Transit Authority* (1971), 132 Ill. App. 2d 402, 406, 270 N.E.2d 553, 555. Plaintiff's counsel's remark that unless the jurors

found for plaintiff, defendant would deny plaintiff's ownership in the future, and his statement, "[s]ee if you find a letter to Mr. Buhrfiend from General Motors" following the trial court's denial of a negative-inference instruction in this regard, do not warrant a new trial here.

To summarize our findings as to defendant's appeal of the jury's damage award, we hold that plaintiff is not precluded as a matter of law from suing for interference with prospective economic advantage where his expected contract would have been voidable; that the jury's findings are not against the manifest weight of the evidence; that the trial court did not abuse its discretion in excluding reference to plaintiff's criminal convictions; and that any improper remarks by plaintiff's counsel in closing argument do not warrant a new trial.

■■■ Turning to plaintiff's cross-appeal of the trial court's denial of his motion for $157,315 in attorney fees, plaintiff contends that defendant's representation that plaintiff did not own an interest in Biggers Chevrolet, made in discovery depositions, his answer, and his testimony at trial violated Supreme Court Rule 219 (107 Ill. 2d R. 219) and section 2—611 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—611).

Plaintiff cites no cases analogous to the case at bar where courts awarded attorney fees under Rule 219's discovery provision. Rule 219 provides that "[i]f a party wilfully obtains or attempts to obtain information by an improper discovery method, wilfully obtains or attempts to obtain information to which he is not entitled, or otherwise abuses these discovery rules, the court may enter any order provided for in paragraph (c) of this rule." (107 Ill. 2d R. 219(d).) The payment of reasonable expenses, including attorney fees incurred by any party as a result of the misconduct, is listed as an appropriate sanction in subsection (c). (107 Ill. 2d R. 219(c).) We reject plaintiff's assertion that the rule contemplates a false statement in a discovery deposition to be an "abuse" of the discovery rules.

Section 2—611 provides for attorney fees in situations involving the signing of pleadings, motions and other papers. Defendant contends that since his pleadings were filed in 1982 before the liberal amendments of section 2—611, section 2—611 as in effect in 1982 applies here. Section 2—611 as it existed in 1982 requires proof that a statement in pleadings was "untrue" and made without "reasonable cause" (Ill. Rev. Stat. 1981, ch. 110, par. 2—611), while section 2—611, as amended in 1986, requires a showing that the belief was not well grounded in fact and warranted by existing law or a good-faith argument (Ill. Rev. Stat., 1986 Supp., ch. 110, par. 2—611). Plaintiff argues that the later version should apply because after the amend-

ments were enacted, defendant did not amend his answer. We need not decide which provision is applicable because we do not believe the trial court's ruling should be reversed under either provision.

The pleading in issue here is defendant's answer denying paragraph 19 of plaintiff's amended complaint. Paragraph 19 of plaintiff's amended complaint provides:

"Contrary to the representations contained in the July 2, 1979, letter of defendant LEO LEICHTER, said defendant, on January 2, 1971, entered into an agreement (a copy of which is attached hereto as Exhibit M) with Eugene A. Lies and MALATESTA pursuant to which MALATESTA purchased from Messrs. Leichter and Lies equal amounts of stock necessary to bring his beneficial interest in Jerry Biggers Chevrolet, Inc. to the maximum percentage allowed in Paragraph 6 of a certain stock representation [sic] agreement entered into on January 2, 1971."

Defendant argues attorney fees should not be awarded for his denial of this paragraph because the allegations are "so garbled and prolix." Because a trial court's decision to deny sanctions should be reversed only upon a clear showing that the court abused its discretion (*Kosoglad v. Porcelli* (1985), 132 Ill. App. 3d 1081, 1093, 478 N.E.2d 489, 497; *Bautista v. Verson Allsteel Press Co.* (1987), 152 Ill. App. 3d 524, 531, 504 N.E.2d 772), we will not reverse the trial court's denial of sanctions here.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMPBELL and O'CONNOR, JJ., concur.