No. 2--02--1299

                                                                                                                                                            

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

                                                                                                                                                            

TRI-G, INC., ) Appeal from the Circuit Court

) of 
McHenry County.

Plaintiff-Appellee and 
)

Cross-Appellant, )

) 

v. ) No. 95--LA--369

)

BURKE, BOSSELMAN AND WEAVER,
 ) 

) 
Honorable

Defendant-Appellant and ) 
Wallace B.  Dunn,

Cross-Appellee. ) Judge, Presiding.

______________________________________________________________________________

PRESIDING JUSTICE O'MALLEY delivered the opinion of the court as to Parts I, II, III, and IV, in which JUSTICE BOWMAN and JUSTICE GILLERAN JOHNSON concur.  JUSTICE BOWMAN delivered the opinion of the court as to Part V, in which PRESIDING JUSTICE O'MALLEY concurs.  JUSTICE GILLERAN JOHNSON dissents from Part V.  

PRESIDING JUSTICE O'MALLEY delivered the opinion of the court:

I. BACKGROUND     

In 1987, plaintiff, Tri-G, Inc. (Tri-G), retained defendant, Burke, Bosselman & Weaver (BBW), to prosecute a complaint against Elgin Federal Bank (Elgin Federal) that Tri-G had filed in 1981.  On the day of trial on the 1981 complaint, the BBW attorney who was handling Tri-G's case claimed that he was not prepared to proceed.  Accordingly, the trial court dismissed Tri-G's case with prejudice.  In 1989, Tri-G filed a legal malpractice action against BBW and received a jury verdict in the amount of $2,337,550.  The trial court denied BBW's posttrial motion, and this appeal ensued.  Tri-G has also filed a cross-appeal.  We affirm in part, reverse in part, and remand for further proceedings.    

The trial of this matter consisted of a "trial within a trial," in which the parties presented evidence pertaining to both the underlying lawsuit between Tri-G and Elgin Federal and the malpractice suit between Tri-G and BBW.  Much of the evidence at trial pertained to whether BBW's negligence caused the dismissal of Tri-G's suit against Elgin Federal, but BBW concedes for purposes of this appeal that its negligence caused the dismissal.  The remaining issue is whether Tri-G would have prevailed in the underlying lawsuit but for BBW's negligence.    

In 1981, Tri-G filed a 10-count lawsuit against Elgin Federal, asserting breach of contract, common-law fraud, and violations of the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (Ill.  Rev.  Stat. 1981, ch. 121 1/2, par. 261 
et seq
. (now 815 ILCS 505/1 
et seq
. (West 2002))).

Tri-G alleged that, in 1976, it was the general contractor for a residential real estate development in McHenry County known as the Huntington Point subdivision.  First National Bank of Woodstock (First National) owned Huntington Point as the trustee of a land trust with Tri-G as beneficiary.   Tri-G alleged that, in 1978, Elgin Federal made construction loans to Tri-G to build residential homes on lots 7, 16, 17, 24, 25, 26, 28, 30, 31, 32, 35, 36, and 37 of Huntington Point.  Tri-G further alleged that it entered into a contract with Chain of Lakes Group (CLG) on August 10, 1978, in which CLG agreed to complete construction on lots 7, 24, 25, 30, 32, 35, 36, and 37. 

Tri-G alleged that Elgin Federal breached its construction loan agreements with Tri-G by making payouts to CLG from the construction loans without the written authorization of Tri-G, and by allowing CLG to submit new contractor's affidavits that Elgin Federal used as a basis for additional payouts in excess of the amounts stated in the original contractor's affidavits submitted by Tri-G.  Tri-G also alleged that Elgin Federal breached the land loan agreement by withholding payouts owed to Tri-G after it entered into the contract for CLG to complete construction on lots 7, 24, 25, 30, 32, 35, 36, and 37.     

Tri-G alleged that Elgin Federal committed common-law fraud by: (1) making unauthorized payouts on the construction loans for lots 16, 17, 26, 28, and 31; (2) withholding money from Tri-G at the time of closing on lots 16, 26, 28, 30, and 37; (3) withholding from Tri-G the fact that Elgin Federal had made unauthorized disbursements to CLG; (4) allowing CLG to substitute new contractor's affidavits for the original contractor's affidavits with respect to the construction loans on lots 7, 16, 17, 24, 25, 26, 28, 30, 31, 32, 35, 36, and 37; and (5) misleading Tri-G into believing that an accounting would be done once all of the lots had been closed upon, at which time Tri-G would receive monies withheld by Elgin Federal.  Tri-G's allegations under the Consumer Fraud Act essentially mirrored those of the common-law fraud count.    

In setting forth its damages, Tri-G itemized the damages incurred with respect to the construction loans on lots 7, 17, 24, 25, 26, 28, 30, 31, 36, and 37.  Tri-G further alleged that it was damaged by unauthorized payouts from a land loan it secured from Elgin Federal in the amount of $30,000. 

Trial on Tri-G's complaint was postponed for several years, during which time Tri-G was represented successively by several law firms.  Finally, the trial court set May 11, 1987, as a date certain for trial.  Tri-G retained BBW in January 1987.  On May 11, 1987, the BBW partner assigned to Tri-G's case answered "not ready" when the case was called for trial.  The trial court dismissed Tri-G's case with prejudice.

Tri-G filed a legal malpractice suit against BBW in 1989 and voluntarily dismissed it in 1994.  Tri-G refiled the malpractice suit in 1995.  In its original complaint, Tri-G alleged that BBW was negligent for (1) failing to file an appearance until May 4, 1987; (2) failing to advise Tri-G’s witnesses and discuss their testimony in advance of depositions; (3) failing to attend certain depositions; (4) failing to properly prepare the case for trial; and (5) failing to seek a voluntary nonsuit on the date of trial.  One month before trial, Tri-G was allowed to amend its complaint to add a claim that BBW was negligent for failing to amend the original complaint against Elgin Federal.  During the malpractice trial, Tri-G was allowed to introduce evidence of fraud and breach of contract relative to incidents not specified in the 1981 complaint, on the theory that these claims would have been brought had BBW properly amended the complaint.

The relevant trial testimony was as follows.  Irene Geschke testified that, in June 1976, she and her husband Clarence (who died prior to trial) purchased a 16.5-acre tract of land with the intent of developing it as the Huntington Point subdivision.  At the time, Irene was working as a real estate broker.  Irene and Clarence obtained a land loan from First National to purchase the property and placed it in a land trust with First National as trustee and Irene and Clarence as beneficiaries.  Irene and Clarence formed Tri-G as general contractor for the development of the property.  Tri-G divided Huntington Point into 46 lots, 45 of which were for single-family homes.  The remaining lot was for a duplex.  Clarence was the sole shareholder of Tri-G and Irene was principally responsible for the operations of Tri-G. 

Irene testified that, in 1977, she approached Dennis Neubert of Elgin Federal regarding financing for Tri-G.  Subsequently, Tri-G obtained a land loan from Elgin Federal to pay off the loan from First National.  The land loan was secured by 38 unsold Huntington Point lots.  Irene also spoke with Neubert about the possibility of obtaining financing for the construction of homes on Huntington Point.  Neubert told Irene that Elgin Federal would finance the construction but would not extend funds for more than four "spec" homes at any one time.  Tri-G introduced into evidence a one-page document from Elgin Federal entitled "Construction Loan Procedure," which dealt with such matters as Elgin Federal's inspections of construction sites and its payouts of loan proceeds to subcontractors and suppliers of materials.  Tri-G also introduced into evidence several loan commitment letters from Elgin Federal that set forth specific terms for each construction loan, such as the loan amount and the rate of interest.  Irene testified that the documents, which purported to memorialize the loan agreements, actually included only some of the loan terms, the remainder having been agreed upon orally by Irene and Neubert.  Irene testified to the following oral terms: (1) payouts from loans would be made only upon Tri-G's written request; (2) each loan was separate such that funds advanced on one loan could not be used for construction on a lot that was subject to a different loan; (3) although interest on a particular loan would begin accruing once funds were disbursed, principal and interest payments on that loan would not be due until all the funds on that loan had been paid out; and (4) the purchaser of a completed home would be given a loan with the same interest rate and terms (9% interest and no points) as the construction loan Tri-G  had obtained for that house.  Finally, Irene and Neubert agreed that if a subcontractor or seller of materials required more funds than were originally stated in Tri-G's affidavit itemizing the costs for constructing the home, Tri-G was required to submit an amended affidavit before the additional funds would be disbursed.  Irene testified that the loan agreements contained no provision for when payouts could be terminated by Elgin Federal.  

 Irene testified that, although she and Neubert agreed that interest payments on any particular loan would not be due until the proceeds had been entirely paid out, Elgin Federal initially billed her for interest, and she paid the bills.  However, Irene stopped paying interest in March 1978. Irene testified that Tri-G's dealings with Elgin Federal initially went smoothly.  When Tri-G needed a payout from one of its loans, Elgin Federal would issue the payout within three days after Tri-G had submitted a payout authorization.  Tri-G  built and sold homes on eight of the Huntington Point lots.  In each case, in accord with the construction loan agreements, the buyer of the home received a loan from Elgin Federal with the same interest rate and terms as Tri-G's construction loan.   Irene testified that Neubert left Elgin Federal in late 1977 and Edward Swartz assumed responsibility for the Huntington Point loans.  Irene testified that Tri-G began having difficulties with Elgin Federal about the time that Swartz took over.  For instance, Elgin Federal's response to payout requests slowed down in early 1978.  Irene testified that the slowdown caused one of Tri-G's suppliers, Hines Lumber, to file a lien in February 1978.  Irene testified that she complained to Swartz about the slowdown in payouts, and Swartz responded that the delay was due to his having just taken over the construction loans from Neubert. 

Irene testified that on April 17, 1978, Swartz sent Tri-G several letters demanding regular monthly payments of principal and interest under three of the construction loans, even though the proceeds had not been paid out entirely on any of these loans.  Irene testified that, without warning from Elgin Federal and without her independent knowledge, payouts stopped altogether on May 26, 1978, during Tri-G's construction of homes on lots 7, 16, 17, 22, 24, 26, 28, 30, 31, 32, 35, 36, 37, and 38.  The total amount of the loans on these 14 projects was $795,797.  As of May 1978, $548,626 in loan proceeds had been paid out and $247,171 remained unpaid.   Irene testified that, contrary to Elgin Federal's position, no interest was due on any of the open loans in May 1978 because the proceeds had not been paid out entirely on any of the loans.  

Irene testified that she received another letter from Swartz on June 16, 1978.  In this letter, Swartz stated that there was a total of $21,688 in delinquent interest on the open construction loans and the land loan.  Swartz demanded that the delinquent interest be paid within 45 days.  Swartz also stated that Tri-G would have to complete construction of four of the homes on which Tri-G  had open loans before Elgin Federal would open any further loans.  Swartz demanded that Tri-G begin advertising its unsold spec homes at "realistic prices."  Swartz also stated that purchasers of Huntington Point houses would receive mortgages at 9.25% and one point.   Swartz threatened that if Tri-G did not comply with the terms of the letter, Elgin Federal would take legal action effective August 1, 1978.    

Irene testified that at no time before the June 16, 1978, letter did Elgin Federal suggest that Tri-G's homes were overpriced.  She also testified that the letter gave no indication that Elgin Federal had decided to terminate payouts, though in fact payouts had ceased several weeks before, unbeknownst to her.  Irene noted that, although Elgin Federal required Tri-G to complete four homes before it could obtain any more loans, Elgin Federal continued to refuse to make payouts, which were necessary for construction.  Irene testified that, had Elgin Federal continued the payouts and allowed construction to finish, Tri-G could have paid the allegedly delinquent interest with proceeds from sales of the homes.  Irene also noted that the terms of the mortgages offered to potential buyers in the June 16, 1978, letter were less favorable than the terms that she and Neubert had agreed upon.

Irene testified that, on June 20, 1978, Elgin Federal sent her bills for interest relative to the loans on lots 16, 26, 30, 31, 35, 36, and 37.  Irene testified that she did not believe that she was obligated to pay any interest because the entire proceeds had not been paid out on any of the loans. 

Irene testified that Swartz sent Tri-G another letter on July 3, 1978, demanding payment of delinquent interest.  Swartz stated that "[p]rior to refinancing any of the existing construction loans to secure additional funds for construction, the delinquency covering April, May and June must be brought current."  Swartz required Tri-G to cure the delinquency on the land loan interest before Elgin Federal would release its interest in any lots that Tri-G might wish to sell to a third party.  Swartz also stated that the terms of the mortgages offered to potential buyers in the letter of June 16, 1978, would be valid only until October 1, 1978, after which current market rates and fees would apply.  Swartz further wrote:

"Also be advised that if no action is taken to complete the homes now financed by

our association and an advertising program instituted to sell the homes at a realistic price and a letter of intent received by our office on or before July 11th, we will have no alternative other than to start legal action.  

We wish to cooperate with you but no action has been taken for the past six months,

therefore, our board feels that it is important to complete this project at an early date or we will ask for a deed in lieu of foreclosure or foreclosure proceedings will commence."

Irene testified that Swartz was incorrect in stating that Tri-G had not worked on the Huntington Point homes for the past six months.   

 Irene testified that she subsequently received a telephone call from Swartz advising her that Elgin Federal had found a buyer, CLG, for the 23 lots in Huntington Point that were still vacant.  CLG proposed to pay $15,000 for each of the vacant lots.  Based on her experience in the real estate market, Irene testified that the fair market value of the lots at that time was $25,000 each.  Irene testified that she had found another party who wanted to buy the lots at a higher price, but Elgin Federal refused to release its mortgages on the lots unless the delinquencies in interest were paid.  Irene testified that Elgin Federal subsequently presented her and Clarence with a contract for the sale to CLG of the 23 vacant lots at the price of $15,000 per lot.  The contract also provided that $9,300 of the purchase price for each lot would be paid to Elgin Federal for the release of the lot under the land loan agreement.  The contract provided not only that CLG would buy the 23 vacant lots but also that CLG would act as general contractor on 8 of the 14 lots where construction was partially completed.  Specifically, CLG would finish construction on lots 7, 24, 25, 30, 32, 35, 36, and 37, and Tri-G would finish construction on the remaining lots.  Tri-G would remain responsible for the loans on all 14 lots.  The contract required CLG to place $2,500 in escrow for each of the eight lots on which CLG agreed to complete construction (totaling $20,000).  Irene testified that the escrow was created to compensate for any shortfall should CLG fail to complete construction of the homes within 90 days of the signing of the contract.  The contract also required Tri-G to pay Elgin Federal $51,300 to cover any deficiency in the open construction loans.  The contract further provided:

"2.  Pay out under the construction loans currently in effect on the partially completed real estate which will be completed by CHAIN OF LAKES GROUPS, INC. will be handled exclusively by CHAIN OF LAKES GROUPS, INC.  CLARENCE O. GESCHKE, IRENE M. GESCHKE and THE FIRST NATIONAL BANK OF WOODSTOCK, as Trustee, will execute whatever documents are necessary to allow CHAIN OF LAKES GROUP, INC. to handle all construction pay outs."

Irene testified that her attorney, Michael Poper, suggested changes to the contract, but Elgin Federal rejected them and essentially gave Tri-G the choice of signing the contract or facing foreclosure on the open loans.  Irene and Clarence agreed to the terms.  The contract was executed on August 17, 1978.  The parties to the contract were First National, as trustee of the land trust; Irene and Clarence, as sole owners of the entire beneficial interest in the land trust; and CLG.  

Irene testified that, after the contract with CLG was signed, Elgin Federal refused to make payouts on the six lots on which Tri-G was to complete construction.  Irene also discovered that  Elgin Federal was permitting CLG to use payouts for purposes other than construction on the eight lots on which CLG was general contractor.  Irene considered this practice to be a violation of the oral construction loan agreements, which did not allow payouts from a particular loan to be applied to a purpose other than construction on the lot for which that particular loan was obtained.  Irene testified that she reviewed Elgin Federal's ledger and determined the amounts of funds that CLG used improperly.  The amounts were as follows: lot 24, $3,925; lot 25, $9,949; lot 30, $17,917; lot 32, $12,774; lot 36, $12,685; lot 37, $17,537.  The total was $75,787.  Irene testified that she complained to Swartz about Elgin Federal's refusal to make payouts on the lots on which Tri-G was to complete construction and about the inappropriate payouts to CLG.  Swartz told her that the contract between CLG and the Geschkes made CLG the agent of First National and deprived Tri-G of any control over the Huntington Point development.    

Irene also testified that Elgin Federal made payouts from the land loan without Tri-G's authorization, contrary to the terms of the land loan.  Tri-G admitted into evidence portions of Elgin Federal's ledger reflecting payouts to subcontractors during the years 1977 through 1979.  Irene identified $21,725 in payouts that she did not authorize. 

Irene also testified that, without Tri-G's approval, CLG submitted its own contractor's affidavits on the eight lots on which it had agreed to finish construction.  Irene considered this a violation of the terms of the construction loan agreements on those lots.  Irene testified that the costs  specified in CLG's affidavits exceeded the costs specified in Tri-G's original affidavits, thus reducing Tri-G's equity in the eight homes. 

Irene testified that Elgin Federal eventually foreclosed on the 14 open construction loans.  Irene testified that, although CLG did not fulfill its contractual promise to complete construction on the eight lots, Elgin Federal returned the $20,000 in escrow funds to CLG without Irene's knowledge or approval.   

Irene testified that she never would have entered into loan agreements with Elgin Federal had she known it did not intend to honor its oral agreements.  She also testified that she would not have entered into the contract with CLG had Elgin Federal not threatened foreclosure and disallowed her from selling the lots to any party other than CLG.

Michael Poper testified that he was the Geschkes' attorney during their dealings with Elgin Federal.  Poper testified that, without notice, Elgin Federal stopped making payouts on May 26, 1978.  Poper noted that, even in June 1978, Elgin Federal still had not formally announced that it had stopped payouts.  When Irene complained about the cessation of payouts, Elgin Federal told her that it would make no more payouts until interest was brought current.  Poper testified that, in his opinion, Elgin Federal's demand for interest was premature under the construction loan agreements.  Poper testified that, if Elgin Federal had continued making payouts, enabling Tri-G to finish constructing the homes, Tri-G could have used the proceeds from the sales of the homes to pay whatever interest was then due.  However, by withholding payouts and thus halting construction, Elgin Federal effectively precluded payment of the interest it demanded.  Over BBW's objection, Poper also testified that he had represented other developers whom Elgin Federal had placed in the same kind of predicament.

John Brittain testified that he was a member of Elgin Federal's board of directors when Elgin Federal extended the land and construction loans to Tri-G in 1977.  At that time, Elgin Federal's standard policy was to require monthly interest payments on construction loans.  Elgin Federal threatened foreclosure in June 1978 because Tri-G had fallen behind in interest payments.  Brittain  acknowledged that Irene had complained to him that Elgin Federal had paid proceeds from certain of Tri-G's construction loans toward deficiencies on other construction loans.  Brittain testified that Elgin Federal commingled funds in this fashion to avoid placing Tri-G in default.  Brittain admitted, however, that such commingling was contrary to Elgin Federal's policies.

Tri-G rested its case, and BBW called Brent Sherman, who testified that he was the founder and sole shareholder of CLG.  Sherman testified to the events surrounding CLG's contract with the Geschkes whereby CLG agreed to purchase 23 vacant lots and to finish construction on several of the remaining lots.  Sherman testified that the contract gave him full authority to request payouts from Elgin Federal on the homes he was completing, yet he nonetheless obtained Irene's approval for all payouts he requested.  Sherman also testified that, because he did not complete construction of the homes within the agreed time, he disbursed to Tri-G $10,000 of the $20,000 CLG had placed in escrow to guarantee completion of the homes.  Sherman admitted, however, that he had no documentation reflecting that payment.  Sherman denied that he ever conspired with Elgin Federal to deprive Tri-G of control over the Huntington Point development.    

Sherman also testified that he had anticipated receiving a profit of $20,000 on each of the 23 lots once construction was complete.  

Edward Swartz testified that he assumed responsibility for Tri-G's loans after Dennis Neubert left Elgin Federal in late 1977.  Swartz testified that, under Elgin Federal's policies, borrowers were responsible for monthly interest payments on their construction loans once funds were disbursed.  Swartz testified that Tri-G initially paid interest on the construction loans without protest but stopped paying in early 1978, giving rise to Elgin Federal's delinquency notices and threats of foreclosure.  Swartz testified that, contrary to Irene's interpretation, the contract between CLG and Tri-G made CLG responsible for interest and principal on the loans relating to the construction it had agreed to finish.  Swartz denied that funds from Tri-G's loans were ever commingled with funds from the loans CLG took over. 

On cross-examination, Swartz conceded that the written construction loan agreements between Elgin Federal and Tri-G did not specify when interest was to be paid.  Swartz admitted that Elgin Federal's procedures were "informal" and that not all policies were in writing.  Swartz acknowledged that the total amount of delinquent interest reflected in his June 16, 1978, letter included interest for June 1978, which in fact was not due until after the date of the letter.  Swartz testified that the characterization of the June interest as delinquent was an innocent error.  Swartz categorically denied that Elgin Federal had ever stopped payouts on any of Tri-G's loans.  Shown documents from Elgin Federal reflecting that the bank had made virtually no payouts between May 26 and September 19, 1978, Swartz speculated that no payouts were made because Tri-G had not requested them. 

Swartz further admitted on cross-examination that, after the contract between CLG and Tri-G was signed, Irene told him several times that she did not want CLG authorizing payouts on the homes CLG agreed to finish and that she was revoking CLG's authority under the contract to make such authorizations.  In response, Swartz told Irene that she would have to cancel the contract in writing if she wanted to stop CLG from authorizing payouts.  

Swartz also admitted on cross-examination that he could point to no document memorializing CLG's assumption of responsibility for interest and principal on the loans relating to the construction projects CLG agreed to complete.  Swartz acknowledged that the fact that foreclosure proceedings were brought against Tri-G when these projects failed indicated that Tri-G remained responsible for the loans despite the contract with CLG.  Swartz also admitted that Elgin Federal commingled funds on Tri-G's loans and that Irene protested the practice on numerous occasions.

In its closing argument, Tri-G sought damages in the following amounts: (1) $75,787 for breach of the construction loan agreements; (2) $21,675 for breach of the land loan agreement; (3) $10,000 for breach of the escrow agreement; (4) $361,000 for fraud that resulted in loss of profits on the 23 vacant lots; and (5) $280,000 for fraud that resulted in loss of profits on the 14 partially completed lots.   The jury returned a verdict finding that BBW was negligent in handling the lawsuit against Elgin Federal and that, but for BBW's negligence, Tri-G would have recovered a verdict against Elgin Federal for $1,168,775 in compensatory damages and $1,168,775 in punitive damages.  The trial court denied BBW's posttrial motion, and this appeal followed.

II.   LIABILITY ISSUES IN BBW'S APPEAL

A.   The Scope of the Malpractice Claim

BBW raises numerous issues on appeal pertaining to both liability and damages.  Addressing liability first, we note that, in order to 
prevail in an action for legal malpractice, the plaintiff must plead and prove the following elements: (1) an attorney-client relationship that establishes a duty on the part of the attorney; (2) a negligent act or omission constituting a breach of that duty; (3) proximate cause establishing that "but for" the attorney's malpractice, the plaintiff would have prevailed in the underlying action; and (4) actual damages.  
Mitchell v. Schain, Fursel, & Burney, Ltd.
, 332 Ill. App. 3d 618, 620 (2002).  

BBW's first argument pertains to the scope of the underlying action for purposes of its liability for legal malpractice.  BBW argues that the trial court improperly enlarged the scope of the underlying action by allowing Tri-G to present allegations of misconduct by Elgin Federal that were not contained in the 1981 complaint.  Tri-G's 1981 complaint alleged breach of contract and fraud in connection with 13 of the 14 lots that were partially completed when Tri-G contracted with CLG.  Tri-G sought damages in the amount of improper payouts to CLG.  However, at trial, Tri-G was permitted to present evidence of misconduct by Elgin Federal relating to all 14 partially completed lots as well as the 23 vacant lots sold to CLG.  Tri-G was permitted to seek damages in the amount of improper payouts and lost profits on the sale of the 23 vacant lots and the 14 partially completed lots.  Tri-G argues that the expanded allegations were properly presented at trial on the theory that BBW failed to amend the 1981 complaint to include the additional allegations.  BBW argues that the trial court erred in allowing Tri-G to amend its malpractice complaint to include the allegation that BBW failed to amend the 1981 complaint.

In January 2002, the trial court allowed Tri-G to amend its malpractice complaint to include an allegation that BBW was negligent for failing to review and amend Tri-G's 1981 complaint against Elgin Federal.  In February 2002, Tri-G was allowed to file another amendment alleging that BBW was negligent for "failing to review and amend the original complaint, as necessary, to conform the Complaint to Plaintiff's expected proofs at trial."  

Pursuant to section 2--616(c) of the Code of Civil Procedure (735 ILCS 5/2--616(c) (West 2002)), an amendment may be allowed at any time before final judgment, on just and reasonable terms.  
The trial court should exercise its discretion liberally in favor of allowing amendments if doing so will further the ends of justice, and it should resolve any doubts in favor of allowing amendments.  
Cantrell v. Wendling
, 249 Ill. App. 3d 1093, 1095-96 (1993).  The four factors applicable to motions to amend are: (1) whether the proposed amendment would cure the defective pleading; (2) whether other parties would sustain prejudice or surprise by virtue of the proposed amendment; (3) whether the proposed amendment is timely; and (4) whether previous opportunities to amend the pleading can be identified.  
Simon v. Wilson
, 291 Ill. App. 3d 495, 508 (1997).
 

The first factor, whether the amendment would cure a defective pleading, is not relevant here.  As for the second factor, while BBW argues that it was prejudiced by the fact that discovery had already closed, it has not pointed to any specific investigation or discovery that it was unable to complete.  Moreover, the new allegation was not a significant departure from the existing allegations against BBW, which enumerated several acts of malpractice, from failing to hire an expert witness to failing to attend depositions.  As for the third factor, which looks to whether the amendment was filed within a reasonable length of time 
(
Loyola Academy v. S & S Roof Maintenance, Inc.
, 146 Ill. 2d 263, 275 (1992)), we cannot say that the timing of the amendment was unreasonable given the complexity of the allegations in the underlying case and the substantial time and resources that Tri-G's attorneys obviously had to expend in investigation.  Last, although we agree with BBW that Tri-G could have amended the complaint earlier, BBW has not shown any prejudice that resulted from the timing of the amendment.  If BBW had needed more time to prepare for trial or to move for summary judgment based on the new allegation, it could have requested additional time.  BBW has not indicated that it made any such request.  In light of these circumstances, we cannot say that the trial court abused its discretion in allowing Tri-G to amend its complaint to include an allegation that BBW was negligent for failing to amend the 1981 complaint against Elgin Federal.    
 BBW also argues that the expansion of Tri-G's allegations beyond the confines of the 1981 complaint violated the "mend the hold" doctrine, which, BBW claims, "prevents a party *** from changing its litigation position *** after litigation has begun."  BBW overstates the breadth of the doctrine, which is designed specifically for the protection of a party alleging breach of contract.  The doctrine "prohibits a party who has repudiated a contract on one ground from changing his ground after litigation has begun."  
Smith v. Union Automobile Indemnity Co.
, 323 Ill. App. 3d 741, 745 (2001); see also 
North American Insurance Co. v. Kemper National Insurance Co.
, 325 Ill. App. 3d 477, 484 (2001) (The "mend the hold" doctrine "estops a contract party from changing the grounds on which he has refused to perform the contract").  BBW does not explain how Tri-G could have "mended the hold" when BBW has not alleged that Tri-G has breached a contract.
(footnote: 1)  

B.  The Evidence Supporting The Malpractice Claim 

Having determined that the trial court did not err in allowing Tri-G to present a claim that BBW breached its duty to Tri-G by failing to prosecute allegations regarding the 23 vacant lots and all 14 partially completed lots, we must now determine whether Tri-G presented sufficient evidence on that claim.  BBW argues that the trial court erred in denying its  motion for a directed verdict and, alternatively, that the jury's verdict was against the manifest weight of the evidence.  

 A court should grant a directed verdict only where " 'all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.' "  
DiCosola v. Bowman
, 342 Ill. App. 3d 530, 539 (2003), quoting 
Pedrick v. Peoria & Eastern R.R. Co.
, 37 Ill. 2d 494, 510 (1967).  We determine 
de novo
 whether a trial court's decision on a motion for a directed verdict was proper.   
Sullivan v. Edward Hospital
, 209 Ill.2d 100, 112 (2004).  

In reviewing the sufficiency of the evidence to support a verdict in a legal malpractice case, the reviewing court determines whether the verdict is against the manifest weight of the evidence.  
Mayol v. Summers, Watson &  Kimpel
, 223 Ill. App. 3d 794, 806 (1992).  A verdict is against the manifest weight of the evidence when the opposite conclusion is clearly evident or when the findings of the jury are unreasonable, arbitrary, and not based on the evidence.  
Mayol
, 223 Ill. App. 3d at 806.
 

While BBW concedes that it was negligent for failing to prosecute the claims in the 1981 complaint, BBW insists that Tri-G failed to prove that BBW was negligent for failing to prosecute claims outside the 1981 complaint, relating to the 23 vacant lots and all 14 of the partially completed lots.  BBW asserts that Tri-G failed to prove to the jury that BBW was negligent for failing to amend the 1981 complaint to include the additional allegations.  BBW argues that Tri-G's efforts in this regard were entirely futile because there was "no way of knowing" whether the trial court would in fact have granted any amendment, and thus any determination by the jury would have been "pure and impermissible speculation."    

Carried to its logical conclusion, this proposition would gut the cause of action of legal malpractice, requiring the plaintiff to prove what in fact would have occurred in the underlying case absent the negligence of the attorney--clearly, an impossible task.  BBW has the entirely wrong approach.  
"The objective [in a legal malpractice lawsuit] is to establish what the result 
should have been
, had the case been filed."  (Emphasis in original.)
  
Nika v. Danz
, 199 Ill. App. 3d 296, 308 (1990).  The sole authority BBW cites for its position is 
Olsen Industries, Inc. v. Pepper, Hamilton & Sheetz
, No. 98--140--SLR (D. Del. March 28, 2000), a federal district court case where, according to BBW, the trial court held that the plaintiff did not prove that the defendant was negligent for failing to move to amend the plaintiff's complaint in the underlying case, because the plaintiff failed to establish that the trial court in the underlying case "would have granted the amendment."  
Olsen
, we note, did indeed frame the issue as whether the trial court in the underlying case "would have granted the motion to amend."  
Olsen
, slip op. at ___.  We also recognize that, in gauging whether the trial court "would have granted" a motion to amend, 
Olsen
 relied in part on the trial court's remark during pretrial proceedings that it would not allow the trial to be delayed for any reason.  Thus, 
Olsen
 did appear to be concerned with what the trial judge would in fact have done if faced with a motion to amend. 
 However, we are not bound by 
Olsen
 because it is a federal district court case.  See 
People ex rel. Burris v. C.J.R. Processing, Inc.
, 269 Ill. App. 3d 1013, 1016 (1995).  In accordance with Illinois precedent (see 
Nika
, 199 Ill. App. 3d at 308), we  reject 
Olsen
's approach and look, not to whether Tri-G's motion to amend would in fact have been granted if brought by BBW, but whether it 
should have been
 granted.  

BBW has failed to cite any authority pertinent to the correct standard.  As noted above, Illinois cases set forth four factors relevant to whether a proposed amendment is appropriate.  See 
Simon
, 291 Ill. App. 3d at 508.  BBW cites none of the factors.  "Mere contentions, without argument or citations of authority, do not merit consideration on appeal."  
McCleary v. Board of Fire & Police Commissioners
, 251 Ill. App. 3d 988, 995 (1993).  BBW's argument is waived.

Waiver aside, we will look at the four factors.  However, we first address a fundamental misconception by BBW.  BBW argues that Tri-G failed to identify for the jury precisely what amendment BBW should have sought.  BBW notes that Joseph Morrison, Tri-G's expert on the standards of adequate legal representation, testified that BBW was negligent for failing to amend Tri-G's complaint, but he did not indicate what additional claims should have been brought.

This argument is based on a false supposition.  It was not for the jury to determine whether the trial court in the underlying case should have granted BBW's motion to amend had it been brought.  A jury has no power to decide whether to permit a party to amend a complaint; that decision is committed to the sound discretion of the trial court as gatekeeper.  See 
Onsite Engineering & Manufacturing, Inc. v. Illinois Tool Works, Inc.
, 319 Ill. App. 3d 362, 368 (2001).  We see no reason why the jury should assume a power in the context of a legal malpractice action that it would not otherwise possess.  It was the trial court's province to determine whether the motion to amend should have been granted had BBW brought it in the underlying case.

We recognize that the trial court never made such a determination but instead held that Tri-G could seek damages on the claims regarding the 23 vacant lots and the 14 partially completed lots because the claims were set forth in the 1981 complaint.  We disagree with the trial court that the 1981 complaint set forth all of these claims.  However, we may affirm the trial court's decision on any basis in the record.  
Witters v. Hicks
, 335 Ill. App. 3d 435, 445 (2002).  Unlike the jury, we have the benefit of knowing what amendment Tri-G claims BBW should have sought in the underlying case.  We hold that the claims outside the 1981 complaint were admissible at the malpractice trial on the basis that a reasonably competent attorney would have filed a motion to amend the complaint to add the claims within a reasonable time after being retained by Tri-G in January 1987, and that such a motion should have been granted because it would have been proper under the prevailing rules of pleading.

We reiterate the applicable standards.  Section 2--616(a) of the Code of Civil Procedure (735 ILCS 5/2--616(a) (West 2002)) provides that the trial court may allow amendments to pleadings on just and reasonable terms, at any time before final judgment.  The trial court should exercise its discretion liberally in favor of allowing amendments if doing so will further the ends of justice, and it should resolve any doubts in favor of allowing amendments.  
Cantrell
, 249 Ill. App. 3d at 1095-96.  The four factors applicable to motions to amend are: (1) whether the proposed amendment would cure the defective pleading; (2) whether other parties would sustain prejudice or surprise by virtue of the proposed amendment; (3) whether the proposed amendment is timely; and (4) whether previous opportunities to amend the pleading can be identified.  
Simon
, 291 Ill. App. 3d at 508.  

We analyze these factors from the premise that, once retained by Tri-G in January 1987 and aware that May 11 was the date certain for trial, a reasonably competent attorney would have immediately reviewed the 1981 complaint to confirm its adequacy and to insure that any amendments would be sought as soon as possible.  Given the interrelation between the claims in the 1981 complaint and the additional claims, a reasonably competent attorney would have had to investigate the dealings between Tri-G and Elgin Federal only a relatively short period of time before determining the existence and viability of the additional claims.  Certainly, a reasonably competent attorney would have sought an amendment well in advance of the May 11 trial. 

The first factor is not relevant because there is no indication that the 1981 complaint had any defects.  As for the second factor, given how closely the claims in the 1981 complaint were related to the additional claims, Elgin Federal could not have credibly claimed prejudice or surprise even if Tri-G introduced evidence of the additional claims at trial and afterwards sought an amendment to conform the complaint to the proof, although, as we noted above, a reasonably competent attorney would have sought an amendment long before that time.  As for the third factor, which concerns whether the amendment was filed within a reasonable length of time (
Loyola Academy
, 146 Ill. 2d at 275), it is clear that an amendment sought before trial in the underlying case, as would be expected of a competent professional in this scenario, would have been reasonable.  As for the fourth factor, a span of several years would have passed between the filing of the complaint in 1981 and any amendment that a reasonably competent attorney would have sought after being retained in January 1987.  However, BBW fails to identify what opportunities Tri-G had to amend its complaint in the intervening years, and in fact altogether fails to mention this or any other factor.  In any event, there is no indication in the case law that any one of the four factors is dispositive.  Indeed, "the primary consideration is whether [the] amendment would further the ends of justice."  
Regas v. Associated Radiologists, Ltd.
, 230 Ill. App. 3d 959, 968 (1992).  An amendment filed by a reasonably competent attorney retained by Tri-G in January 1987 clearly would have met two of the three relevant factors and would have furthered the ends of justice by allowing Tri-G to state all viable claims.

We conclude, therefore, that a reasonably competent attorney should have been allowed to amend Tri-G's complaint in the underlying lawsuit to add the additional claims.  By failing to take advantage of this opportunity to set forth all of its client's viable claims, BBW breached its professional duty.
(footnote: 2) 

Next, we determine whether Tri-G proved that it would have recovered on the allegations against Elgin Federal but for BBW's negligence.  BBW's challenge here is narrow.  BBW does not dispute that Tri-G prevailed on its breach of contract claims regarding the construction loans, the land loan, and the escrow agreement.  Rather, BBW limits its challenge to the common-law fraud and consumer fraud claims.

To prevail on a claim for common-law fraud, the plaintiff must prove: (1) a false statement of material fact; (2) that the party making the statement knew or believed it to be untrue; (3) that  the party to whom the statement was made had a right to rely on the statement; (4) that the party to whom the statement was made did rely on the statement; (5) that the statement was made for the purpose of inducing the other party to act; and (6) that the reliance by the person to whom the statement was made led to that person's injury.  
Siegel v. Levy Organization Development Co.
, 153 Ill. 2d 534, 542-43  (1992).  In its general sense, "fraud" means anything calculated to deceive, including all acts, omissions, and concealments involving a breach of legal or equitable duty, trust, or confidence resulting in damage to another.  
Carey Electric Contracting, Inc. v. First National Bank of Elgin
, 74 Ill. App. 3d 233, 236 (1979).  

 To prevail on a claim under the Consumer Fraud Act, the plaintiff must prove: (1) a deceptive act or practice by the defendant; (2) that the defendant intended for the plaintiff to rely on the deception; (3) that the deception occurred in the conduct of a trade or commerce; (4) that the plaintiff suffered actual damages; and (5) that the damages were proximately caused by the deceptive conduct.  
Oliveira v. Amoco Oil Co.
, 201 Ill. 2d 134, 149 (2002).  A plaintiff alleging a violation of the Consumer Fraud Act does not have to show actual reliance on the deceptive act or that the defendant committed the deceptive act in bad faith.  
Capiccioni v. Brennan Naperville,  Inc.
, 339 Ill. App. 3d 927, 933 (2003).  A defendant need not have intended to deceive the plaintiff; innocent misrepresentations or omissions intended to induce the plaintiff's reliance are actionable under the statute.  
Capiccioni
, 339 Ill. App. 3d at 933. 

The jury was instructed that, according to Tri-G, the following acts, representations, and omissions by Elgin Federal were fraudulent: 

1.  Without notice, Elgin Federal terminated payouts on Tri-G's construction loans

on or about May 26, 1978, on lots 16, 17, 33, 24, 25, 26, 28, 30, 31, 32, 35, 36, and 37.

2.  Elgin Federal withheld from Tri-G the fact that it had terminated payouts on Tri-

G's construction loans on lots 16, 17, 22, 24, 25, 26, 28, 30, 31, 32, 35, 36, and 38 on or about May 26, 1978.

3.  Elgin Federal withheld from Tri-G the fact that BBW's delinquent interest claim

of $14,614.71 in its letter of June 16, 1978, included nondelinquent interest for the month

 of June 1978.

4.  Elgin Federal stated in its letter of June 16, 1978, that it would take legal action,

effective August 1, 1978, if Tri-G did not comply with Elgin Federal's requests, even though

Elgin Federal had no security interest upon which it could foreclose.

5.  Without cause, Elgin Federal moved up by 20 days the threatened date of legal

action if Tri-G did not meet the demands in the letter of July 3, 1978.

6.  Elgin Federal withheld from Tri-G the fact that Elgin Federal had decided to have

CLG take over the Huntington Point project.

7.  Elgin Federal withheld from Tri-G the fact that CLG had filed new contractor's

affidavits as to the construction loans on the homes CLG was to complete.

8.  Elgin Federal withheld from Tri-G the fact that Elgin Federal had agreed to allow

funds from open construction loans to be paid out for purposes other than construction on

the homes for which the funds had been borrowed.

9.  Elgin Federal withheld from Tri-G the fact that Elgin Federal had returned

$20,000 in escrow funds to CLG.

10.  Elgin Federal concealed from Tri-G the fact that Elgin Federal did not intend to

deal with Tri-G on any of the construction loans once the contract was signed with CLG.

11.  When Elgin Federal stated that it would not open any additional loans with Tri-

until Tri-G completed four homes, Elgin Federal concealed from Tri-G the fact that Elgin Federal did not intend to open up the construction loans so that the homes could be finished.

12.  Elgin Federal refused to follow Tri-G's instruction that Elgin Federal was not to

make payouts to CLG without Tri-G's permission.

The instructions stated that these alleged acts, representations, and omissions were the basis for both the common-law fraud and consumer fraud counts.  The instructions for the common-law fraud counts specifically indicated that Tri-G alleged that the enumerated acts, representations, and omissions were intended by Elgin Federal "to deceive [Tri-G] and to induce [it] to enter into a contract with a third party [CLG] to complete the Huntington Point development."  The damages Tri-G sought on all the fraud claims were the profits it would have received from the sale of the 23 vacant lots and the 14 partially completed lots had Elgin Federal not induced it to enter a contract with CLG.

BBW contends that Elgin Federal's conduct constituted "at most" a breach of the loan agreements.  We disagree.  The evidence discloses that Elgin Federal not only breached the loan agreements by conditioning payouts on the payment of monthly interest, but engaged in a continuous effort to deceive Tri-G into believing that payouts were continuing and would continue.  Elgin Federal's deception was primarily one of silence and implication, though deception soon evolved into coercion.  Payouts from Elgin Federal slowed down in early 1978, prompting one of Tri-G's suppliers to file a lien.  Irene complained to Swartz about the slowdown in payouts, and Swartz responded that the delay was due to his adjustment to his new responsibilities.  Though by this time Irene had stopped making interest payments, Swartz did not even note the existence of a delinquency when he spoke with Irene.  Indeed, it is undisputed that Elgin Federal did not apprise Tri-G of any delinquency until June 1978, though by that time Elgin Federal had terminated payouts altogether, without any notice to Tri-G.  Moreover, although the June 1978 delinquency notice required Tri-G to finish four homes before Elgin Federal would extend any new loans, Elgin Federal continued to withhold the very funds that were needed to complete construction.  Thus, according to Irene and Poper, Elgin Federal itself created the predicament that prompted Tri-G to sell the 23 vacant lots.  The evidence shows that Elgin Federal continued to exert its influence by refusing to approve the sale of the 23 vacant lots to a buyer found by Tri-G, instead insisting that CLG buy the lots at a price below fair market value.  Even after the forced sale, Elgin Federal withheld payouts for no valid reason on the six lots that Tri-G had agreed to finish under the contract with CLG.  Elgin Federal further breached the construction loan agreements by permitting CLG to use funds from one loan toward a purpose other than constructing the home on the lot that was the subject of the loan.  Because CLG was not using the loan proceeds toward the construction of the 8 homes and because Elgin Federal ceased payouts on the remaining 6 homes that Tri-G was building, the homes were not completed and Elgin Federal eventually foreclosed on all 14 loans.  

 BBW's witnesses contradicted Tri-G's on certain points.  First, contrary to Irene's testimony, Swartz flatly denied that Elgin Federal ever terminated payouts on the construction loans.  When confronted with documentary evidence that payouts were indeed terminated, Swartz speculated that no payouts were recorded because Tri-G did not request them during the relevant periods.  Second, Swartz and Brittain both testified that Elgin Federal's policy was to demand interest payments once funds were disbursed, while Irene testified that Tri-G's construction loan agreements with Elgin Federal did not require interest payments on any particular loan until the proceeds on that loan had been paid out in full.  It was the province of the jury to observe the demeanor of the witnesses, judge their credibility, and weigh their testimony.  
Rodgers v. Withers
, 229 Ill. App. 3d 246, 250 (1992).  We see no basis for upsetting the jury's determination.              

In our assessment, the evidence shows a course of deception by Elgin Federal that had the ultimate effect of depriving Tri-G of several Huntington Point lots.  The trial court properly denied BBW's motion for a directed verdict on the common-law fraud and consumer fraud counts.     

BBW advances several arguments in support of a reversal or a new trial.  First, BBW argues that the contract among CLG, First National, and the Geschkes established CLG as the agent of First National.  Thus, BBW argues, Elgin Federal was entirely within its rights in following CLG's directions regarding payouts, and Irene cannot claim that Elgin Federal breached the construction loan agreements.  This argument falls wide of the mark.  Even if CLG was the agent of First National, Elgin Federal would not be excused from complying with the provisions of the oral construction loan agreements, which, according to Irene, flatly prohibited the commingling of funds.  Irene testified that Elgin Federal's improper commingling of funds allowed CLG to receive payouts for purposes other than work on the lots that CLG had agreed to complete.  The jury evidently accepted Irene's testimony and concluded that, as a result of Elgin Federal's breach of the construction loan agreements, the construction of several Huntington Point homes was not completed and the loans were foreclosed on.  Although, as noted above, the evidence was conflicting on certain points, we cannot say that the jury's determination was erroneous.  Therefore, BBW's argument that the contract made CLG the agent of First National is entirely beside the point. 

Second, BBW argues that the trial court erred in admitting the testimony of Thomas Myers, a banking and financing consultant, and in excluding evidence that the Geschkes had financial difficulties in construction projects besides Huntington Point.  BBW argues that Myers' testimony was improper because he lacked personal knowledge of the loan transactions at issue and simply gave opinions regarding the propriety of Elgin Federal's policies and actions.  BBW also argues that the testimony about the Geschkes was relevant as showing that Elgin Federal had a sound basis for taking preventative steps once Tri-G became delinquent on the loans.  These arguments are waived, as BBW cites no authority for either one.  
"Mere contentions, without argument or citations of authority, do not merit consideration on appeal."  
McCleary
, 251 Ill. App. 3d at 995.  At any rate, so overwhelming was the evidence against BBW that any error in these rulings would have been harmless.  See 
Hiscott v. Peters
, 324 Ill. App. 3d 114, 122 (2001) (reviewing court will not reverse an evidentiary error unless the error was prejudicial such that the result of the trial was materially affected).

BBW also argues that the trial court erred in admitting Poper's testimony that Elgin Federal 

dealt improperly with other developers besides Tri-G.  BBW asserts that Poper's testimony "was improper and highly prejudicial to BBW" because it concerned "matters unrelated to Huntington Point or any other project in which [First National], Tri-G or the Geschkes [were involved]."  BBW does not elaborate on this bald assertion, thus begging the question of just how the matters Poper addressed were "unrelated" to the transactions at issue.  BBW appends to this bare remark the further conclusory remark that Poper's testimony was not properly disclosed pursuant to Supreme Court Rule 213 (177 Ill. 2d R. 213).  Both of these points are waived for lack of development.  See 
McCleary
, 251 Ill. App. 3d at 995.  Moreover, any error would have been harmless given the weight of the evidence against BBW.  See 
Hiscott
, 324 Ill. App. 3d at 122. 

III.   LOST COMPENSATORY DAMAGES AWARDED TO TRI-G

BBW challenges the award of lost compensatory damages.  First, BBW argues that the trial court erred in allowing Tri-G to seek and recover compensatory damages representing profits that Tri-G would have made on the sale of the 23 vacant lots and the 14 partially completed lots but for Elgin Federal's misconduct.  BBW advances several contentions on this point.  BBW argues initially that the trial court was bound by the ruling of Judge Ward S. Arnold, who, as presiding judge in the underlying lawsuit, ruled that Tri-G was not entitled to lost profits.  BBW argues that Judge Arnold's ruling is binding because "[a] legal malpractice action places the plaintiff in the same position he or she would have occupied but for the attorney's negligence" and "[t]he plaintiff can be in no better position by bringing suit against the attorney than if the underlying action had been successfully prosecuted or defended" (
Sterling Radio Stations, Inc. v. Weinstine
, 328 Ill. App. 3d 58, 64 (2002)).  BBW cites this principle alone as support for its argument, but the principle does not obviously dictate the result BBW seeks.  As Tri-G suggests, the principle is best read in the light of another principle: "The objective [in a legal malpractice lawsuit] is to establish what the result 
should have been
, had the case been filed."  (Emphasis in original.) 
 
Nika
, 199 Ill. App. 3d at 308.  If, as BBW suggests, the trial court in a legal malpractice action must adopt the legal conclusions of the trial court in the underlying lawsuit, whether correct or incorrect, there certainly would be no guarantee that the malpractice action would achieve the goal of determining what the result 
should have been
 in the underlying lawsuit.  
We reject BBW's argument.

BBW also argues that the principle of 
res judicata
 dictates that the prior order is binding.  Tri-G has filed a motion to strike this argument because BBW raised it for the first time in its reply brief, in violation of 
Supreme Court Rule 341(e)(7) (188 Ill. 2d R. 341(e)(7)).  BBW responds that it raised the argument in its opening brief, in a footnote.  However, it is not proper to raise substantive arguments in a footnote.  
Lundy v.  Farmers Group, Inc.
, 322 Ill. App. 3d 214, 218 (2001).  Because BBW's 
res judicata 
argument is not mentioned anywhere in the body of the brief, we grant the motion to strike it.
 
   

Next, BBW argues that Tri-G has no claim to lost profits because Tri-G admitted at trial that it had no beneficial interest in the Huntington Point lots.  BBW argues: 

"In Tri-G's 1981 Complaint, Tri-G alleged that it owned a beneficial interest in the Huntington Point land.  However, Tri-G later 
admitted at trial in the Malpractice Lawsuit 
that it was 
not
, in fact, the owner of Huntington Point and had no ownership interest in Huntington Point or in any of the lots that comprised Huntington Point."  (Emphasis in original.)  

BBW's argument is self-defeating.  The testimony that Tri-G was not the owner of the lots came from Irene, yet BBW characterizes her testimony as Tri-G's testimony.  Thus, BBW admits a business identity between Irene and Tri-G.  This is a significant concession, for it is undisputed that Irene and Clarence had a beneficial interest in Huntington Point and as such were proper parties to receive profits from the sale of the lots.  

Notably, the 1981 complaint alleged that Tri-G was the beneficial owner of Huntington Point, and BBW never amended the complaint after it was retained by Tri-G in January 1987.   Not only are we unsympathetic to BBW's turnabout on this issue, but we note that, ironically, BBW's malpractice in failing to amend the complaint now undercuts this asserted defense to that very same malpractice.  If BBW had thought that Tri-G was not the beneficial owner of Huntington Point, BBW should have amended the complaint to make that correction.   

BBW also argues that Tri-G did not provide an adequate basis for estimating Tri-G's lost profits with respect to the partially completed lots.  At trial, Tri-G relied on Sherman's testimony that  he anticipated selling the 23 vacant lots for a profit of $20,000 each once construction was complete.  BBW argues that Sherman's testimony was inadequate because it concerned CLG's, not Tri-G's, endeavors and, to boot, concerned CLG's 
past
 endeavors.  Notably, BBW cites no authority for the contention that Tri-G's reliance on CLG's endeavors was improper 
per se
.  Therefore, we will not address that contention.  As for the assertion that Tri-G's reliance on CLG's 
past
 endeavors was improper, BBW cites 
Drs. Sellke & Conlon, Ltd. v. Twin Oaks Realty, Inc.
, 143 Ill. App. 3d 168, 174 (1986), for the rule that 
"[e]vidence of past success in similar endeavors is not sufficient to support an award of lost profits, as conditions may vary with each endeavor."  Both 
Drs. Sellke & Conlon
 and the case upon which it relies, 
Favar v. Riverview Park
, 144 Ill. App. 86 (1908), are factually distinguishable because they both dealt with profits expected in new, untested  businesses.  "Illinois courts have generally found in situations where lost profits are sought for interruption or delay in a business that the 'reasonable certainty' requirement may be satisfied through evidence of a plaintiff's past profits in an established business, but that the lost profits of a new business would be too speculative."  
Malatesta v. Leichter
, 186 Ill. App. 3d 602, 621 (1989).  Sherman testified that, before he became involved in Huntington Point in the summer of 1978, he had spent several years in the construction business, which he characterized as "profitable" for him.  BBW does not dispute that the 23 vacant lots were comparable to the 14 partially completed lots individually or that Sherman's business of selling homes for profit was comparable to Tri-G's business of selling homes for profit.  Given these concessions and Sherman's significant experience in the construction business, we believe that Sherman's testimony as to the profits he expected on the 23 vacant lots was an adequate basis for calculating Tri-G's lost profits on the 14 partially completed lots. 

BBW's last argument on compensatory damages is that the award Tri-G received is excessive.  We need not decide how this argument is impacted by BBW's failure to challenge the proof supporting the allegations of breach of contract, because the argument is waived for lack of development.  BBW's argument is twofold.  First, BBW asserts that the award "was not supported by the record" and had "no basis in fact."  BBW neglects to support these forceful remarks with any reference to the evidence at trial.  
"Mere contentions, without argument or citations of authority, do not merit consideration on appeal."  
McCleary
, 251 Ill. App. 3d at 995.  BBW challenges the damages award on the additional basis that it significantly exceeded the damages Tri-G specified in its closing argument.  
BBW itemizes the amounts Tri-G requested and notes that they total $748,562, which is only two-thirds of the award of $1,168,775.  BBW argues that the award should be reduced  at least to what Tri-G requested.  BBW presupposes here that a damages award should not exceed the specific amount requested by the plaintiff.  BBW's sole authority for this proposition is 
Ash v. Wallenmeyer
, No. 85--C--8557 (N.D. Ill. May 4, 1990), where the court reduced a damages award to the amount requested by the plaintiff.  
Ash
 is a federal district court case and therefore is not binding on this court.  
Burris
, 269 Ill. App. 3d at 1016.  Moreover, 
Ash
 relied specifically on a provision of federal procedural law in reducing the damages award.  BBW points to no analogous provision in Illinois law.  Even if we found 
Ash
 persuasive, we could not in good conscience follow its example without knowing the posture of Illinois law on the issue.  BBW cites no such Illinois authority.

The discussion of the lost punitive damages awarded to Tri-G is reserved for Part V of this opinion, which is delivered by Justice Bowman.  

IV.  TRI-G'S CROSS APPEAL

Tri-G's first argument in its cross-appeal is that the trial court erred in denying Tri-G's request for interest on the damages award.  Tri-G separates the interest it seeks into two types: (1) "prejudgment" interest, covering the period from June 1978, when the wrong was committed by Elgin Federal, to June 1, 1987, the approximate date that a verdict against Elgin Federal would have been returned but for BBW's negligence, and (2) "postjudgment" interest, covering the period from June 1, 1987, through February 28, 2002, when the judgment against BBW was entered.

"Prejudgment interest is proper where authorized by statute, agreement of the parties, or in cases where warranted by equitable considerations."  
Progressive Land Developers, Inc. v. Exchange National Bank of Chicago
, 266 Ill. App. 3d 934, 945 (1994).  Equitable principles "dictate that when money has been wrongfully withheld the victim receive interest for the wrongdoer's retention of his money."  
In re Estate of Wernick
, 127 Ill. 2d 61, 87 (1989).  Tri-G argues that, had a damages award been entered against Elgin Federal  in 1987, Tri-G would have been entitled to prejudgment interest on the award on equitable grounds because Elgin Federal wrongfully withheld funds from Tri-G. 

Tri-G also argues that, because BBW failed to obtain a judgment against Elgin Federal in 1987, BBW is responsible for postjudgment interest, extending from June 1, 1987, when the judgment would have been entered, through February 28, 2002, when Tri-G finally recovered on its allegations against Elgin Federal.  Tri-G relies on section 2--1303 of the Code, which provides in relevant part: 

"Interest on Judgment.   Judgments recovered in any court shall draw interest at a 

rate of 9% per annum from the date of the judgment until satisfied ***.  When judgment is

entered upon any award, report or verdict, interest shall be computed at the above rate, from

the time when made or rendered to the time of entering judgment upon the same, and included in the judgment."  735 ILCS 5/2--1303 (West 2002).

Tri-G cites no authority for the notion that section 2--1303 applies to judgments that should have been entered but were not.  The primary objective in statutory interpretation is to accord the text its plain meaning.  
In re the Minor Child Alexis Stella
, 339 Ill. App. 3d 610, 614 (2003).  Section 2--1303 speaks of judgments recovered, not judgments that should have been recovered.  Tri-G recovered no judgment in this action until February 28, 2002, and therefore this is the date by which interest will be reckoned.  Thus, the interest Tri-G seeks is entirely 
pre
judgment interest, but of two types.  The interest covering the period from June 1978 to June 1, 1987, is sought from BBW only derivatively, the ultimate basis being Elgin Federal's wrongdoing.  By contrast, the interest covering the period from June 1, 1987, to February 28, 2002, is claimed directly on the basis of BBW's own negligent misconduct.  

Whether Tri-G is entitled to interest depends on the nature of the claims on which it seeks interest.  Illinois does not allow nonstatutory prejudgment interest on a legal malpractice claim or indeed on any type of claim at law.  See 
Wilson v. Cherry
, 244 Ill. App. 3d 632, 640 (1993) (denying prejudgment interest on a legal malpractice claim based on defendant's failure to advise plaintiff of tax savings option); 
Continental Casualty Co. v. Commonwealth Edison Co.
, 286 Ill. App. 3d 572, 579 (1997) (nonstatutory prejudgment interest not available in cases at law).  Tri-G  asserts no persuasive statutory basis for its claim to interest.  Therefore, Tri-G's claim to prejudgment interest from June 1, 1987, to February 28, 2002, clearly fails because it is based directly on legal malpractice, a claim at law. 

By contrast, the prejudgment interest for the period from June 1978 to June 1, 1987, is claimed ultimately on the basis of Elgin Federal's misconduct.  Tri-G argues that an equitable award of interest is necessary to make Tri-G whole because Elgin Federal wrongfully withheld funds from Tri-G.  Tri-G's claim is defeated by the form of the compensatory damages award.  Only a small part of the damages requested by Tri-G represented wrongful payouts from Elgin Federal.  While an award of equitable interest on those requested amounts might be appropriate, we are unable to determine whether the jury actually awarded those amounts, because the damages award was not itemized.  Therefore, Tri-G's claim fails.

Lastly, Tri-G argues that the trial court erred in denying its request for attorney fees and costs under the Consumer Fraud Act.  See 815 ILCS 505/10a(c) (West 2002) (the court "may award *** reasonable attorney's fees and costs to the prevailing party").  Tri-G claims it is entitled to "the attorneys fees that should and would have been awarded in the underlying case pursuant to the [Consumer Fraud Act]."  Tri-G elaborates: 

"If BBW had done its job and [Tri-G] had prevailed in the Elgin Federal suit, [Tri-G]

would have had the right to petition for fees to help defray the cost of litigating the case.  Tri-

G was forced to bring suit against BBW to obtain the redress that it should have obtained from Elgin Federal.  Now, however, it has to compensate counsel entirely out of its own pocket.  Unless Tri-G is given the right to file a fee petition comparable to that which it would have been able to file in the Elgin  Lawsuit, it will not be made whole."

The trial court denied Tri-G's request for the following reasons: (1) the underlying case was never tried,  so no attorney fees were incurred; (2) Tri-G's damages included the $5,000 retainer fee paid to BBW in 1987; (3) any attorney fees recovered in 1987 would have gone to BBW, not Tri-G; and (4) no attorney fees are available in a legal malpractice case in the absence of statutory authority or an agreement between the parties.

We disagree with the reasoning of the trial court.  The Consumer Fraud Act provides for the reimbursement of the attorney fees and costs incurred by the prevailing party.  Had BBW not been negligent, Tri-G would have prevailed on its consumer fraud claims in the underlying suit and Elgin Federal would have been the party from whom attorney fees and costs were sought.  Having been thwarted by BBW's negligence from prosecuting the consumer fraud claims in the underlying lawsuit, Tri-G now brings the allegations of consumer fraud in the context of this malpractice case.  Tri-G is entitled to seek from BBW the attorney fees and costs that Tri-G incurred in prosecuting the consumer fraud allegations in this case.  Only in this way is Tri-G assured the full benefit of the Consumer Fraud Act.  

BBW argues that the attorney fees and costs that Tri-G seeks under the Consumer Fraud Act are part of the total damages Tri-G seeks from BBW, and therefore Tri-G should have submitted its request for attorney fees and costs to the jury rather than to the trial court.  BBW is mistaken.  The Consumer Fraud Act does not authorize jury trials.  
Martin v. Heinold Commodities, Inc.
, 163 Ill. 2d 33, 74-77 (1994).  The trial court may not delegate its fact-finding function on consumer fraud claims to the jury.  
Rubin v. Marshall Field & Co.
, 232 Ill. App. 3d 522, 531 (1992).  Notably, neither party seems to recognize that the submission of the consumer fraud claims to the jury in this case was error.  The error would have been compounded had the trial court submitted the question of attorney fees and costs to the jury.    

Tri-G is allowed on remand to request costs and attorney fees incurred in prosecuting the consumer fraud allegations.  The trial court must consider the request as if it were directed against Elgin Federal, for it would been so directed but for BBW's negligence.  The trial court must apply the factors relevant to requests for attorney fees and costs under the Consumer Fraud Act.  See 
Majcher v. Laurel Motors, Inc.
, 287 Ill. App. 3d 719, 730 (1997) (listing relevant factors).

BOWMAN and GILLERAN JOHNSON, JJ., concur.

JUSTICE BOWMAN delivered the opinion of the court:

V.   LOST PUNITIVE DAMAGES AWARDED TO TRI-G 

As for the award of lost punitive damages, BBW argues that the award was improper as a matter of law and, alternatively, excessive in light of the evidence at trial.  

First, BBW argues that Illinois law does not permit a plaintiff in a legal malpractice case to recover lost punitive damages.  This is a matter of first impression.  Section 2--1115 of the Code of Civil Procedure (735 ILCS 5/2--1115 (West 2002)) states that "[i]n all cases, whether in tort, contract or otherwise, in which the plaintiff seeks damages by reason of legal, medical, hospital, or other healing art malpractice, no punitive, exemplary, vindictive or aggravated damages shall be allowed."  BBW relies on this provision as support for its argument that a legal malpractice plaintiff is barred from recovering lost punitive damages from a negligent attorney.  Tri-G, on the other hand, argues that the punitive damages it lost as a result of BBW's negligence are properly characterized as compensatory and, therefore, are not prohibited by section 2--1115.  As we stated, our research has revealed no Illinois case dealing with this issue.  Thus, we will examine case law from other jurisdictions that have addressed this subject.

In other jurisdictions, there are conflicting decisions on this issue.  Courts in California and New York have held that lost punitive damages are not recoverable in a legal malpractice case.  
Ferguson v.  Lieff, Cabraser, Heimann & Bernstein, LLP
, 30 Cal. 4th 1037, 69 P.3d 965, 135 Cal. Rptr. 2d 46 (2003); 
Summerville v. Lipsig
, 270 A.D.2d 213, 704 N.Y.S.2d 598 (2000).  However,  the United States District Court for the District of Columbia, as well as courts in Arizona, Colorado, Kansas, and South Dakota have taken the opposite approach.  See 
Jacobsen v. Oliver
, 201 F. Supp. 2d 93 (D.C. 2002); 
Elliot v. Videan
, 164 Ariz. 113, 791 P.2d 639 (1989); 
Scognamillo v. Olsen
, 795 P.2d 1357 (Colo. Ct. App. 1990); 
Hunt v.  Dresie
, 241 Kan. 647, 740 P.2d 1046 (1987); 
Haberer v. Rice
, 511 N.W.2d 279 (S.D. 1994)
.  The latter courts have determined that a plaintiff in a legal malpractice action may recover as compensatory damages those damages that he would have been awarded as punitive damages in the underlying action.   

The courts that have declined to allow recovery of lost punitive damages in a legal malpractice suit have relied upon public policy reasons as the bases of their decisions.  In  
Ferguson
,  the California Supreme Court determined that allowing recovery of lost punitive damages would defeat the punitive and deterrent purposes of punitive damages by punishing someone other than the tortfeasor who committed the intentional or malicious acts that gave rise to the punitive damages claim.  In addition, the amount of the award of lost punitive damages would bear no relationship to either the gravity of the negligent attorney's misconduct or his wealth.  
Ferguson
, 30 Cal. 4th at 1046-48, 69 P.3d at 970-71, 135 Cal. Rptr. 2d at 53-54. 

The court in 
Ferguson
 further held that recovery of lost punitive damages would violate public policy against speculative damages, because such damages necessarily involve a moral judgment, which does not lend itself to an objective determination.  In addition, the court concluded that the standard of proof applicable to claims for lost punitive damages is so complex that it militates against allowing recovery of such damages.  Next, the court determined that allowing recovery of lost punitive damages would detrimentally affect courts' abilities to manage and resolve mass tort actions, by discouraging the use of mandatory non-opt-out punitive damages classes.  The court reasoned that class counsel would not agree to use such mandatory classes if they were potentially liable for punitive damages to class members who were unhappy with the amount of punitive damages the class received.  
Ferguson
, 30 Cal. 4th at 1048-50, 69 P.3d at 971-72, 135 Cal. Rptr. 2d at 54-55. 

Last, the majority in 
Ferguson
 concluded that allowing malpractice plaintiffs to recover lost punitive damages would increase malpractice insurance costs or cause insurers to cease providing professional liability insurance to attorneys, thereby placing great costs upon attorneys who would then pass those costs on to their clients.  The majority dismissed the idea that the recovery of lost punitive damages is necessary to make a successful plaintiff whole in a legal malpractice action.  Rather, it took the position that a plaintiff is made whole by compensatory damages and that punitive damages constitute a windfall to which a plaintiff has no entitlement.  
Ferguson
, 30 Cal. 4th at 1050-51, 69 P.3d at 972-73, 135 Cal. Rptr. 2d at 55-56. 

Unlike in 
Ferguson
, courts that have allowed a legal malpractice plaintiff to recover lost punitive damages from a defendant attorney have placed their focus not on the purpose behind punitive damages, but on the purpose behind compensatory damages.  In 
Jacobsen
, the United States District Court for the District of Columbia refuted the reasoning the court utilized in 
Ferguson
.  The court in 
Jacobsen
 quoted the following with approval:
   

" '[T]he issue is not the purpose of punitive damages, but the purpose of compensatory damages, which is to give the client what she lost because of the lawyer's negligence....Essentially, as a result of the lawyer's negligence, the punitive damages recoverable from the original tortfeasor become compensatory damages recoverable from the lawyer.' "  
Jacobsen
, 201 F. Supp. 2d at 101, quoting M.  Freedman, 
Caveat Lector: Conflicts of Interest of ALI Members in Drafting the Restatements
, 26 Hofstra L. Rev. 641, 653 (1998).

Similarly, in 
Hunt
, the Kansas Supreme Court stated that in a legal malpractice case " 'all the damages are simply those which proximately resulted from [the] attorneys' negligence; they are no longer properly called punitive damages.' "   
Hunt
, 241 Kan. at 661, 740 P.2d at 1057.  Likewise, the South Dakota Supreme Court held that "[t]he punitive damages which may have been awarded in the underlying claim are part and parcel of the damages [the plaintiff] suffered as a result of [the attorney's] alleged negligence."  
Haberer
, 511 N.W.2d at 286. 

Courts in favor of allowing recovery of lost punitive damages have also cited the goal of deterrence as a reason in support of their decisions.  "Attorneys who appreciate that they will be liable in malpractice actions for 'lost punitives' will be motivated to exercise reasonable care in investigating or defending punitive damages claims."  
Jacobsen
, 201 F. Supp. 2d at 101-02; see also 
Hunt
, 241 Kan. at 661, 740 P.2d at 1057.

Consistent with the majority of courts that have considered this issue, we view the lost punitive damages in the underlying case as compensatory damages in the malpractice case.  We believe the proper focus of our analysis to be what would make the plaintiff whole with respect to the defendant attorney's negligence.  When, as in this case, a jury has determined that the plaintiff would have been entitled to punitive damages but for the negligence of the attorney, then such damages must be recoverable in order for the plaintiff to be made whole.  We note that this result is consistent with the general principle in this state that "[a] legal malpractice plaintiff is entitled to recover those sums which would have been recovered if the underlying suit had been successfully prosecuted."  
Weisman v.  Schiller, Ducanto & Fleck
, 314 Ill. App. 3d 577, 580 (2000).  Based on (1) our view of lost punitive damages as compensatory and (2) the fact that such damages are not imposed for the purpose of punishing the attorney who commits malpractice, we hold that section 2--1115 does not bar the recovery of lost punitive damages in a legal malpractice case.

The dissent insists that, in holding BBW responsible for lost punitive damages, we "ignore[] the well-settled principle that punitive damages are not awarded as compensation or to make a plaintiff whole," but instead are intended to function like a "criminal penalty."  Slip op. at 46.  According to the dissent, we are "punish[ing] negligent attorneys for the reprehensible and fraudulent conduct of Elgin Federal."  Slip op. at 49.  Of course, a punitive damages award was not imposed against BBW.  The verdict form designates the $2,337,550 simply as "damages," and one of the special interrogatories specifies what amount of that award represents punitive damages that Tri-G would have recovered but for BBW's negligence.  Thus, the judgment against BBW is designed to compensate, not punish.  The dissent does not dispute that BBW's negligence deprived Tri-G of a punitive damages award and that Tri-G will not recover all sums it would have been awarded in the underlying lawsuit unless BBW is directed to pay an amount equal to the lost punitive damages award.  "A legal malpractice plaintiff is entitled to recover those sums which would have been recovered if the underlying suit had been successfully prosecuted."  
Weisman
, 314 Ill. App. 3d at 580.  BBW simply has been called to account for the full consequences of its professional negligence. 

The dissent also states that our holding violates Illinois public policy against "transfer[ring] punishment and deterrence intended for a malicious, fraudulent, or deliberately oppressive wrongdoer onto another who has not acted with such a wanton disregard."  Slip op. at 47.  The dissent cites 
Beaver v. Country Mutual Insurance Co.
, 95 Ill. App. 3d 1122, 1122 (1981), which held that public policy disallows "insurance against liability for punitive damages that arise out of an insured's own misconduct."  The court reasoned: 

" 'Where a person is able to insure himself against punishment he gains a freedom of misconduct inconsistent with the establishment of sanctions against such misconduct.  *** 

The policy considerations in a state where *** punitive damages are awarded

for punishment and deterrence, would seem to require that the damages rest ultimately as well [
sic
] nominally on the party actually responsible for the wrong.  If that person were permitted to shift the burden to an insurance company, punitive damages would serve no useful purpose.  Such damages do not compensate the plaintiff for his injury, since compensatory damages already have made the plaintiff whole.  And there is no point in punishing the insurance company; it has done no wrong.' "  
Beaver
, 95 Ill. App. 3d at 1124, quoting 
Northwestern National Casualty Co. v. McNulty
, 307 F.2d 432, 440-41 (5th Cir. 1962).  

Beaver
 is easily distinguishable.  There, an award of punitive damages was imposed against a party for his own conduct, and the court held that responsibility ought to remain with that party.  By contrast, as we noted above, a punitive damages award has not been imposed against any party to this dispute.  Rather, BBW has been made to compensate Tri-G for the recovery, composed in part of punitive damages, that was denied it by BBW's negligence.  Elgin Federal, the party that should have been punished, was insulated by BBW's negligence, and now BBW is being held liable for the full consequences of that negligence, in accord with the dictate that a legal malpractice plaintiff is entitled to whatever sums it would have recovered in the underlying action but for the malpractice.  BBW is not being punished; it is being made to compensate.          

Of course, the corollary of the dissent's assertion that BBW is being punished is the assertion that Elgin Federal, the true wrongdoer, is 
not
 being punished as the law of punitive damages intends.  According to the dissent, if the wrongdoer escapes compensatory and punitive liability through the intervening cause of legal malpractice, the law must deny the victim the entire recovery it would have achieved but for the malpractice, for to force the negligent attorney to make recompense for the lost punitive damages would not punish the wrongdoer.  The dissent appears to believe that the purpose of punitive damages is served only if the wrongdoer itself is made to pay damages.  We disagree.  Illinois views punitive damages as a punishment designed to serve three distinct purposes: (1) to act as retribution against the wrongdoer; (2) to deter the wrongdoer from committing similar wrongs in the future; and (3) to deter others from similar conduct.  
NC Illinois Trust Co. v. First Illini Bancorp, Inc.
, 323 Ill. App. 3d 254, 267 (2001).  The latter two purposes are served as effectively by the judgment against BBW as if Elgin Federal itself had been made to pay.  The fact that Elgin Federal has fortuitously dodged a bullet does not significantly undermine the specific deterrent to Elgin Federal nor diminish at all the general deterrent to others.  The aim of retribution is also satisfied because Elgin Federal is branded with the stigma of having been judged worthy of sanction for outrageous conduct.  

The dissent ignores a more fundamental point, however.  If the dissent is correct that the only purpose of punitive damages is to punish the defendant, that purpose would be equally served if the State, not the plaintiff, were the recipient of the damages (see 735 ILCS 5/2--1207 (West 2002))
, yet, under American law generally and in this case, the plaintiff is the recipient.  
What is the reason for this?  Perhaps it lies in the evolution of punitive damages:

"The doctrine [of punitive damages] was originally used by English courts as a means of justifying awards of damages in excess of the tangible harm suffered by the plaintiff.  [Citation.]  In the 1760's, punitive damages began to take on a dual nature; first, as compensation for intangible wrongs such as mental distress and suffering; and secondly, as punishment for the defendant. [Citation.]

***

Then as courts began to recognize the award of actual damages for intangible

harms, the compensatory nature of the doctrine fell into disuse.  The courts began to

focus instead on the punitive nature of the doctrine.  [Citation.]  This change in focus was first reflected in Illinois in [
Hawk v. Ridgway
, 33 Ill. 473, 476 (1864),] where the supreme court ruled that '[w]here the wrong is wanton, or it is willful, the jury are authorized to give an amount of damages beyond the actual injury sustained, as a punishment, and to preserve the public tranquility.'  [Citation]    

Today, the nature of punitive damages in Illinois is clearly singular--it is

punishment
 for the defendant. [Citation.]"  (Emphasis in original.)  
Hazelwood v. 
 
Illinois Central Gulf R.R.
, 114 Ill. App. 3d 703, 712 (1983). 

At one time, punitive damages justifiably went to the plaintiff as additional compensation.  Now that the compensatory aspect is gone, why do they still go to the plaintiff?  Perhaps to encourage the vindication of private wrongs, perhaps for some other reason.  Though the rationale may be lost in history, punitive damages remain the entitlement of the plaintiff, not the State.  Therefore, where the wrongdoer's conduct warrants punitive damages and legal malpractice prevents the plaintiff from recovering those damages from the wrongdoer itself, the negligent attorney must compensate the plaintiff for its loss, or else the plaintiff will not have recovered all that it would have recovered in the underlying lawsuit and, moreover, the purposes of punitive damages will not have been served.   

The dissent concludes by putting forth a litany of questions, a parade of undesirables, that purports to reduce our decision to absurdity.  The litany culminates with the question, "[C]an [attorneys] *** be liable for failing to seek punitive damages awards?"  Slip op. at 49.  The answer, of course, must be "yes" because "[a] legal malpractice plaintiff is entitled to recover those sums which would have been recovered if the underlying suit had been successfully prosecuted."  
Weisman
, 314 Ill. App. 3d at 580.

Having decided that Illinois law permits a legal malpractice plaintiff to receive an award of lost punitive damages from a defendant attorney, we examine whether the award in this case was justified by the evidence at trial.  Punitive damages may be awarded where the defendant acted willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.  
Cress v. Recreation Services, Inc.
, 341 Ill. App. 3d 149, 182 (2003).  An award of punitive damages will not be overturned on appeal unless it is clearly the result of passion, partiality, or corruption. 
Cress
, 341 Ill. App. 3d at 182.  BBW argues that Elgin Federal committed no fraud at all, and certainly not aggravated fraud.  BBW asserts that Elgin Federal did not violate Tri-G's rights but actually forwent remedies under the construction loan agreements once Tri-G was in breach.  BBW contends that, although Tri-G defaulted on interest payments after the 1978 sale to CLG, Elgin Federal refrained from pursuing remedies against Tri-G.  BBW also asserts that, although Tri-G never repaid all funds extended under the construction loan agreements, Elgin Federal has not sought to recover the amounts.  BBW believes that these actions show Elgin Federal's lack of bad faith.   

On the contrary, the evidence discloses a course of wanton conduct by Elgin Federal.  Elgin Federal made unwarranted demands for monthly interest payments from Tri-G and threatened foreclosure based on Tri-G's supposed interest delinquency.  However, even before Elgin Federal notified Tri-G of the supposed delinquency, it stopped payouts on the construction loans, without notice.  When Tri-G sought to sell certain lots to pay off the delinquency, Elgin Federal refused to release its interest in the lots unless Tri-G sold to CLG for a price less than fair market value.  Thus, the evidence discloses that Elgin Federal, not Tri-G, was the party in breach of the construction loan agreements and that Elgin Federal breached the agreements in a malicious manner obviously designed to dispossess Tri-G of the Huntington Point lots.  There is ample justification in the record for the award of punitive damages.

VI.  CONCLUSION

For the foregoing reasons, we reverse the judgment of the circuit of McHenry County denying Tri-G's requests for attorney fees and costs under the Consumer Fraud Act, and affirm the judgment in all other respects.  We remand the cause for further proceedings consistent with this opinion.   

Affirmed in part and reversed in part; cause remanded.

O'MALLEY, P. J., concurs.

JUSTICE GILLERAN JOHNSON, concurring in part and dissenting in part:

I concur in all but Part V.  I agree with the majority that there was no prejudicial divergence between the allegations in Tri-G's complaint and the allegations at trial.  I also agree that the jury's verdict with regard to lost compensatory damages was not against the manifest weight of the evidence.  Finally, I agree that the trial court erred in denying Tri-G attorney fees and costs.  However,  I disagree that the award of lost punitive damages was proper. 

In Illinois, punitive damages may be awarded only when torts are committed with fraud, actual malice, deliberate violence or oppression, wilful conduct, or gross negligence in disregard of the rights of others.   
Kelsay v. Motorola, Inc.
, 74 Ill. 2d 172, 186 (1978).  In line with this principle, section 2--1115 of the Code of Civil Procedure (the Code) provides:  

"In all cases, whether in tort, contract or otherwise, in which the plaintiff seeks damages by reason of legal, medical, hospital, or other healing art malpractice, no punitive, exemplary, vindictive or aggravated damages shall be allowed."  735 ILCS 5/2--1115 (West 2002).

As is clear, a plaintiff may not seek punitive damages in a legal malpractice action. 

The majority attempts to circumvent our common law and section 2--1115 of the Code by mischaracterizing punitive damages lost due to attorney malpractice as compensatory damages.  The majority reasons that these lost punitive damages must be recovered in order for the plaintiff to be made whole.  However, the majority ignores the well-settled principle that punitive damages are not awarded as compensation or to make a plaintiff whole.  See 
Gertz v. Robert Welch, Inc.
, 418 U.S. 323, 350, 41 L. Ed. 2d 789, 811, 94 S. Ct. 2997, 3012 (1974).  

Punitive damages are not compensation for loss and have nothing to do with the detriment suffered by a plaintiff.  
Gray v. National Restoration Systems, Inc.
, No. 1--01--4062, slip op. at 35 (April 16, 2004).  Rather, the function of punitive damages is similar to that of a criminal penalty.  
Beaver v. Country Mutual Insurance Co.
, 95 Ill. App. 3d 1122, 1123 (1981).  Punitive damages are intended to punish the malicious, fraudulent, or deliberately oppressive wrongdoer and to deter that wrongdoer and others from committing like offenses in the future.  
Stojkovich v. Monadnock Building
, 281 Ill. App. 3d 733, 743 (1996).  Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.  Restatement (Second) of Torts §908 (1979).  It should be presumed that a plaintiff has been made whole by compensatory damages, so punitive damages should be awarded only if the defendant's culpability is so reprehensible that it warrants the imposition of further sanctions to achieve punishment or deterrence.  See  
BMW of North America, Inc. v. Gore
, 517 U.S. 559, 568, 134 L. Ed. 2d 809, 822, 116 S. Ct. 1589, 1595 (1996). 

Punitive damages, or exemplary damages as they are sometimes called, originated in the English courts in the eighteenth century as a means of justifying awards of damages in excess of the plaintiff's tangible harm.  See 
Huckle v. Money
, 2 Wils. K.B. 205, 95 Eng. Rep. 768 (C.P. 1763); 
Wilkes v. Wood
, Lofft 1, 18-19, 98 Eng. Rep. 489, 498-99 (C.P. 1763).
  Indeed, punitive damages are a windfall to a plaintiff.  
Naqvi v. Rossiello
, 321 Ill. App. 3d 143, 150 (2001).  Punitive damages are, therefore, not favored in the law, and courts should take caution to see that punitive damages are not improperly or unwisely awarded.  
Kelsay v. Motorola, Inc.
, 74 Ill. 2d 172, 188 (1978).   Punitive damages pose an acute danger of arbitrary deprivation of property.  
State Farm Mutual Automobile Insurance Co. v. Campbell
, 538 U.S. 408, 417, 155 L. Ed. 2d 585, 600, 123 S. Ct. 1513, 1520 (2003).   They are an "anomaly of excessive compensation."  
Piscitelli v. Friedenberg
, 87 Cal. App. 4th 953, 980, 105 Cal. Rptr. 2d 88, 107 (2001).  

It is inconsistent with Illinois public policy to transfer punishment and deterrence intended for a malicious, fraudulent, or deliberately oppressive wrongdoer to another who has not acted with such a wanton disregard.  For instance, in  
Beaver
, 95 Ill. App. 3d at 1124, the Illinois Appellate Court, First District, determined that insurers may not insure against liability for punitive damages that arise out of an insured's own misconduct.  The 
Beaver
 court reasoned:

" 'The policy considerations in a state where *** punitive damages are

awarded for punishment and deterrence, would seem to require that the damages rest

ultimately as well [
sic
] nominally on the party actually responsible for the wrong.

 If that person were permitted to shift the burden to an insurance company, punitive

damages would serve no useful purpose.  Such damages do not compensate

the plaintiff for his injury, since compensatory damages already have made the

plaintiff whole.  And there is no point in punishing the insurance company; it has

done no wrong.  In actual fact, of course, and considering the extent to which the

public is insured, the burden would ultimately come to rest not on the insurance

companies but on the public, since the added liability to the insurance companies

would be passed along to the premium payers.  Society would then be punishing itself for the wrong committed by the insured.' "  
Beaver
, 95 Ill. App. 3d at 1124-25, quoting 
McNulty
, 307 F.2d at 440-41.

In 
Penberthy v. Price
, 281 Ill. App. 3d 16 (1996), the Illinois Appellate Court, Fifth District, cautiously considered whether a punitive damages claim should survive against the estate of an intoxicated motorist.  The 
Penberthy
 court delineated two factors to be weighed in determining whether a punitive damages claim should survive or be transferable.  
Penberthy
, 281 Ill. App. 3d at 21.  The first factor is whether the requested punitive damages have a statutory basis or an integral part of a regulatory scheme.  
Penberthy
, 281 Ill. App. 3d at 21.  The second factor is whether strong equitable considerations favor the survival of the claim for punitive damages.  
Penberthy
, 281 Ill. App. 3d at 21.  After weighing the two factors, the 
Penberthy
 court determined that the punitive damages claim should survive against the intoxicated motorist's estate because of an overwhelming equitable consideration, that being the need to deter other drunk drivers.    

Penberthy
 is unlike the present case.  There is no equitable need to punish an attorney who was negligent, especially in view of a statutory scheme that prohibits such punishment.   Indeed, the Restatement (Second) of Torts guides us that punitive damages should not be awarded for mere inadvertence, mistake, errors of judgment, and the like, which constitute ordinary negligence.  Restatement (Second) of Torts §908 (1979).  Furthermore, assessing lost punitive damages against an attorney is not likely to deter that attorney or other attorneys from future negligence.  Negligence is most often caused by inadvertence, by which the negligent party is unaware of the results that may arise from his act.  W. Keeton, Prosser & Keeton on Torts §31, at 169 (5th ed. 1984).   However, negligence may also arise where a negligent party has considered the possible consequences carefully and then exercised his best judgment.  W. Keeton, Prosser & Keeton on Torts §31, at 169 (5th ed. 1984). 

The majority defies the above principles and punishes negligent attorneys for the reprehensible and fraudulent conduct of Elgin Federal.  I fear that in doing so, the majority has set in motion a train that may be difficult to stop.  If attorneys can be liable for lost punitive damages, can they also be liable for inadequate punitive damages awards?  And if attorneys can be liable for inadequate punitive damages awards, can they also be liable for failing to seek punitive damages?  And if attorneys can be liable for failing to seek punitive damages, how can they be discouraged from seeking punitive damages in cases in which they may be only remotely, if at all, recoverable?

In sum, I would hold consistently with the jurisdictions of California and New York, that a plaintiff may not recover punitive damages lost by reason of attorney malpractice.

   

FOOTNOTES
1: 1 
BBW also argues that the trial court erred in permitting Tri-G to amend its complaint to bring a claim for professional malpractice based on a breach of a provision of the Code of Professional Responsibility, because no such cause of action exists under Illinois law.  See 
Nagy v. Beckley
, 218 Ill. App. 3d 875, 879 (1991).  Tri-G's complaint and the jury instructions reference the Code of Professional Responsibility, not as the basis for an independent cause of action, but simply as a codification of the common-law duty of lawyers toward their clients.    

2:
2
 BBW also argues that the jury instructions on the issue of BBW's failure to amend were defective.  Because that issue was for the trial court, not the jury, and we determine that BBW was negligent in failing to amend, any defect in the jury instructions on that issue could not have been prejudicial.